**UNITED STATES of America,
Appellee,**

v.

**Martel LAWES, Defendant–Appellant.**

**Docket No. 00–1707.**

United States Court of Appeals,
Second Circuit.

Argued: June 5, 2001.

Decided: May 31, 2002.

Larry H. Krantz, Krantz & Berman LLP, New York, N.Y. (Marianne Yen, of counsel), for Defendant–Appellant.

Daniel Margolis, Assistant United States Attorney, New York, N.Y. (Mary Jo White, United States Attorney, Leslie C. Brown, Assistant United States Attorney, and Ping C. Moy, Assistant United States Attorney, of counsel), for Appellee.

Before: WINTER, McLAUGHLIN, and POOLER, Circuit Judges.

Judge POOLER dissents in a separate opinion.

WINTER, Circuit Judge.

Martel Lawes appeals from his conviction by a jury before Judge Duffy for illegal possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1). On appeal, he argues that: (i) the district court should have suppressed the firearm as evidence because it was discovered in the course of an allegedly unlawful search; (ii) the district court should have questioned prospective jurors during voir dire about their attitudes toward police officers; and (iii) the district court improperly barred cross-examination about a witness's motive to lie. We affirm.

## BACKGROUND

This being an appeal from a denial of a motion to suppress and a conviction after a trial, we view the facts in the light most favorable to the government. *See Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Fields*, 113 F.3d 313, 319 (2d Cir.1997); *United States v. Peterson*, 100 F.3d 7, 11 (2d Cir.1996). Appellant was arrested by New York City Detective Robert Martin and Officer Anthony Bencivengo on the night of January 1, 2000. At that time, Martin and Bencivengo were in an unmarked police car looking for a murder suspect. They possessed a mugshot of the suspect and pedigree information that described him as a twenty year-old black male, weighing 160 pounds and being 5'9" tall, with a visible scar on one arm. As they drove through the Parkchester section of the Bronx, Martin spotted appellant walking on a sidewalk approximately one block from where the murder had taken place. From his viewpoint in the car, Martin believed that appellant closely matched the picture of the suspect. Martin then alerted Bencivengo, who agreed that appellant might be the suspect.

Martin stopped the car while still behind appellant, and Bencivengo got out to follow appellant on foot. Martin then drove the car past appellant and parked. Martin got out of the car, approached appellant, and identified himself as a police officer. He told appellant that he would like to speak with him and asked appellant to put down a bag that he was carrying. As appellant placed the bag on the ground, he turned his body so that his right hand was no longer visible to Martin. This alarmed Martin, and he reached around appellant to grab his arm. In doing so, Martin felt a hard object near appellant's waist that felt like the butt of a gun. Martin shouted a warning codeword to Bencivengo, and they subdued and handcuffed appellant. Martin and Bencivengo thereafter retrieved a loaded gun from appellant's waistband. The two policemen realized that appellant was not the murder suspect only after taking him into custody.

Before appellant's trial commenced, he moved to suppress the gun on the theory that it was the product of an invalid search. The district court denied this motion. Appellant also requested, along with the government, that the district court question prospective jurors during voir dire about possible bias involving police officers. In particular, appellant wanted the district court to ask: "Does any juror or any member of his or her family have any relationship or friendship with any city, state or federal law enforcement officer?" and "Would any juror attach greater weight to the testimony of a witness because he or she happens to be a Government employee or law enforcement agent as opposed to a witness who is not so employed?"

The district court declined to ask these questions. Instead, in questioning each potential juror individually, the district court primarily asked about: (i) where

they lived; (ii) where they worked; (iii) whether they lived with any other adults and, if so, what were their occupations; (iv) whether they had served on a jury before; (v) whether they could be fair and impartial; and (vi) whether they were willing to serve.

After the jury was selected and the trial began, the government presented evidence that the gun possessed by appellant came from out-of-state and that he had previously been convicted for a felony under the name Clement Christopher Tomlinson. The government also called Martin and Bencivengo to testify about the events leading up to appellant's arrest. Before Bencivengo appeared as a witness, however, the government moved to preclude appellant from questioning him about an earlier finding by the Civilian Complaint Review Board that Bencivengo, in an unrelated incident, had used excessive force against an arrestee. Over appellant's objection, the district court granted this motion, concluding that this evidence was not particularly probative and might distract the jury from the salient issues.

The jury convicted appellant, and this appeal followed.

## DISCUSSION

a) *Motion to Suppress*

 Appellant argues that the district court should have suppressed the gun as evidence because the police officers did not harbor a reasonable suspicion that he was the murder suspect when they stopped him. In reviewing a district court's denial of a motion to suppress, we must uphold the district court's findings unless they are clearly erroneous. *See Fields*, 113 F.3d at 319; *Peterson*, 100 F.3d at 11. However, whether a suspicion leading to a search is reasonable is a question of mixed fact and law, which we review *de novo. See id.;*

*United States v. Bold*, 19 F.3d 99, 102 (2d Cir.1994).

Appellant relies principally upon the dissimilarity between his appearance and the description of the murder suspect. While the suspect was described as a twenty year-old black male, weighing 160 pounds and 5'9" in height, appellant is thirty-four years old, weighs 200 pounds, and is 6'1" in height. Furthermore, unlike the suspect, he has no scar on his arm but does have a scar on his face, under his right eye.

The district court credited the testimony of the officers and concluded that the dissimilarity between the suspect's description and appellant did not fatally undermine the reasonableness of the policemen's suspicion. The district court compared the mugshot of the suspect carried by the officers on the night of the arrest with a photograph of appellant and concluded that they had similar facial features. The court also noted that Martin and Bencivengo had been informed by some sources that their suspect was 6', rather than 5'9", tall. Finally, the court noted that Martin and Bencivengo saw appellant at night and in the middle of winter, when appellant was wearing a heavy coat. The district court concluded that the policemen discovered the gun only after acting on a reasonable suspicion.

 We cannot say that the district court's conclusion was in error. Reasonable suspicion is not a high threshold, and the "requisite level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Tehrani*, 49 F.3d 54, 58 (2d Cir. 1995) (internal quotation marks omitted). Thus, notwithstanding some differences in the description between the suspect and appellant, the match between the two men was, under the circumstances—nighttime and a person in a heavy coat—close enough to justify a reasonable suspicion.

*See United States v. Jackson,* 652 F.2d 244, 248–49 (2d Cir.1981).

### b) *Voir Dire*

 Appellant maintains that the district court erred when it refused to quiz prospective jurors during voir dire about their relationships with, and attitudes toward, police officers. A district court is "accorded ample discretion in determining how best to conduct ... voir dire." *Rosales–Lopez v. United States,* 451 U.S. 182, 189, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981); *see also United States v. Millar,* 79 F.3d 338, 342 (2d Cir.1996). Moreover, a district court has "broad discretion whether to pose a defendant's requested voir dire questions." *United States v. Kyles,* 40 F.3d 519, 524 (2d Cir.1994). Accordingly, we will not reverse unless we determine that this discretion has been abused. *See United States v. Salameh,* 152 F.3d 88, 121 (2d Cir.1998).

Voir dire is necessarily a matter in which the trial court has extremely broad discretion. Voir dire is of course an important part of trial proceedings, but federal trial judges are not required to ask every question that counsel—even all counsel—believes is appropriate. Court and counsel have somewhat different goals in voir dire. The court wants a fair and impartial jury to be chosen and to move expeditiously to the presentation of evidence. Counsel want a jury favorable to their cause—fair or not—and voir dire aids them in exercising peremptory challenges and challenges for cause. Counsel have an additional purpose in voir dire moreover and that involves exposing jurors to various arguments they intend to make at trial. Counsel view voir dire as an opportunity for advocacy similar to, albeit not the equivalent of, openings or summations. This additional purpose has led to a long struggle between bench and bar—in both

the state and federal courts, *see, e.g., United States v. Barnes,* 604 F.2d 121, 142 n. 10 (2d Cir.1979); *United States v. L'Hoste,* 609 F.2d 796, 801–03 (5th Cir.1980); *United States v. Bryant,* 471 F.2d 1040, 1043–45 (D.C.Cir.1972) (per curiam)—in which the bar has sought the right to question jurors at great length. Thus far, federal courts have successfully resisted such attempts. *See United States v. Diez,* 736 F.2d 840, 844 (2d Cir.1984); *see also* Fed. R.Crim.P. 24(a); Fed.R.Civ.P. 47(a).

 We are, therefore, reluctant to reverse a conviction solely because a particular question(s) was not asked on voir dire. Because trial strategy and voir dire are inseparable, there will be, in any case, large numbers of questions that counsel would like to ask, or to have asked, in order to press their view of the case to potential jurors. On appeal, however, a party can easily claim that the failure to ask any one or series of questions impaired its exercise of peremptory challenges or created a possibility of a jury harboring a particular prejudice. In reviewing such a claim, therefore, we should recognize that the selection by a district judge of voir dire questions must balance (i) the need to afford counsel a "feel" as to each potential juror both to allow a reasonable exercise of challenges and to exclude individuals with viewpoints that might impair an impartial weighing of the evidence against (ii) the need to avoid use of the voir dire as a mini-trial that delays the presentation of evidence.

The questioning of potential jurors on voir dire is, therefore, quintessentially a matter for the discretion of trial courts. Indeed, the history of appellate court reversals for a district court's failure to pose "must-ask" questions is a mixed one. For example, appellant relies heavily upon the Ninth Circuit's decision in *United States v. Contreras–Castro,* 825 F.2d 185 (9th Cir.

1987). *Contreras–Castro* involved some facts similar to the present case, namely the predominance of police witnesses, and the Ninth Circuit reversed the district court for its failure to inquire whether prospective jurors had any bias for law-enforcement officers. *Id.* at 187. However, since then, the Ninth Circuit has made a career of distinguishing that case. *See, e.g., United States v. Nielsen,* 1 F.3d 855, 859 (9th Cir.1993); *United States v. Payne,* 944 F.2d 1458, 1474–75 (9th Cir. 1991); *United States v. Powell,* 932 F.2d 1337, 1340–41 (9th Cir.1991). Indeed, the district court in *Powell* asked nearly identical questions during voir dire as the district court did in this case, and the Ninth Circuit ruled that it was sufficient to ask prospective jurors whether they could be fair generally, without making a more specific inquiry regarding the police. *Id.*

■ This court appears never to have reversed a conviction for the failure to ask a particular question on the voir dire of prospective jurors. Of course, a voir dire may be so insufficient as to call for a reversal, but the record viewed as a whole must show either: (i) a voir dire so demonstrably brief and lacking in substance as to afford counsel too little information even to draw any conclusions about a potential juror's general outlook, experience, communication skills, intelligence, or life-style, *cf. United States v. Rhodes,* 556 F.2d 599, 600–01 (1st Cir.1977) (reversing because trial court's voir dire question was so ambiguous that no prospective juror or counsel could be sure what exactly was asked); (ii) a failure to inquire about, or warn against, a systematic or pervasive bias, including one that may be short-lived but existent at the time of trial, in the community that would have been cured by asking a question posed by a party, *see e.g., Morgan v. Illinois,* 504 U.S. 719, 733–34, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992); *Ham*

*v. South Carolina,* 409 U.S. 524, 526–27, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973); or (iii) a record viewed in its entirety suggesting a substantial possibility that a jury misunderstood its duty to weigh certain evidence fairly that would have been clarified by asking a requested voir dire question, *cf. United States v. Gelb,* 881 F.2d 1155, 1164–65 (2d Cir.1989). None of those conditions are met here.

Appellant does not claim that the failure to ask the questions he posed rendered the voir dire here so perfunctory as to fall within (i).

■ The nature of his argument does suggest, however, that the bias favoring law-enforcement officials was so pervasive in New York City that it should be asked in all cases in which the credibility of such officials is important in a criminal case. We do not exclude the possibility that, at some time or in some place, the existence of a systematic bias favoring law-enforcement officials may be, or have been, demonstrable, but that is not presently the case in the Southern District of New York.

The New York Times has reported, well before more recent highly publicized incidents involving violence by members of the New York City Police Department, that juries in New York City show a healthy skepticism of prosecution cases built entirely on the credibility of police officers. *See* Clifford Krauss, *Bratton Announces Plan to Train Officers to Testify,* N.Y. Times, Nov. 15, 1995, at B3; Joe Sexton, *Jurors Question Honesty of Police,* N.Y. Times, Sept. 25, 1995, at B3; Joe Sexton, *Types of Perjury Common Among Police Officers Are Detailed,* N.Y. Times, April 23, 1994, at 27. Since those reports, the prosecution of the police officers in a case of an accidental shooting had to be moved from New York City to Albany because of community anger, *see People v. Boss,* 261 A.D.2d 1, 701 N.Y.S.2d 342, 346–47 (1999)

(per curiam) (changing venue for trial of police officers for accidental shooting of Amadou Diallo), and every officer charged in the cases involving the aggravated brutality toward Abner Louima, *see United States v. Aleman*, 286 F.3d 86 (2d Cir. 2002) (Aleman and Rosario); *United States v. Schwarz*, 283 F.3d 76 (2d Cir. 2002) (Schwarz, Wiese, Bruder, Volpe, and Bellomo); *United States v. Volpe*, 224 F.3d 72 (2d Cir.2000) (Volpe), was convicted by a jury—including officers whose convictions have been reversed by this court on the ground of legally insufficient evidence. *See Schwarz*, 283 F.3d at 110 (reversing convictions for conspiracy to obstruct justice in violation of 18 U.S.C. §§ 371, 1503). We therefore do not believe that there was such a pervasive bias favoring police officers in New York City at the time of trial as to render the failure to ask the questions proposed by appellant's counsel reversible error *per se*.

The questions proposed by appellant were not that different from a range of other questions that counsel would like asked about potential witnesses. Numerous trials involve witnesses who have occupations with reputations earned and unearned—e.g., government officials, accountants, doctors, members of the clergy—or who represent a vast array of ethnicities or personal appearances that are arguably the subject of stereotypes relevant to credibility. As the Fourth Circuit has remarked, if a district court "must, on pain of reversal, ask the venire whether they would give heightened credibility to the testimony of a police officer when the Government's case depends on law-enforcement testimony, logic compels that a similar question be asked whenever the Government's case depends on the testimony of any identifiable class of witnesses that might conceivably be thought by jurors to be inherently credible, be they firefighters, priests, physicians, attorneys, butchers, bakers, or candlestick makers." *United States v. Lancaster*, 96 F.3d 734, 741 (4th Cir.1996) (en banc). Moreover, appellant's argument would support claims for "must-ask" questions relating to various factual and other theories counsel intend to use at trial, e.g., "Can you believe that a skilled and reputed [name any professional] might [name a corresponding professional mistake]?" "Are you able to find for and compensate a person injured as a result of [the mistake by a reputed professional]?" and so on.

█ We turn then to (iii), viewing the record in this case as a whole, whether there is a substantial possibility that the jury misunderstood its duty not to accord the testimony of law-enforcement officials credibility solely because of their office. We believe that the record rebuts any such danger.

In *Gelb*, we rejected a claim that a failure to ask on voir dire cautionary questions about testimony of law-enforcement agents is *per se* reversible. 881 F.2d at 1164–65. We held, rather, that the issue essentially turns on weighing: (i) the importance of law-enforcement testimony to the case as a whole, taking into account the extent to which the credibility of that testimony is challenged or is corroborated by non-agent witnesses; and (ii) the extent to which the issue of law-enforcement testimony is covered by questions on voir dire and by the charge to the jury. *See id.* We recognize that *Gelb* is distinguishable because the law-enforcement testimony in that case was of marginal importance, *see id.*, whereas such testimony was critical to the conviction here. Nevertheless the record of the voir dire and charge to the jury in this case demonstrate that the jurors received adequate cautions about bias toward law-enforcement officers.

First, the questions asked would reveal whether the potential juror or a member of the juror's household was in law enforcement, the most compelling circumstances with regard to the need for further inquiry. Moreover, when such circumstances were revealed, the court followed up with pertinent questions regarding credibility. For example, near the beginning of the voir dire and in the presence of the jury pool, the district court asked a woman whose husband was a secret service agent whether she could evaluate the testimony of a law-enforcement official the same as anyone else. In so doing, the district court emphasized that the jury must "recognize that people are people, no matter what they are." Second, when another potential juror stated during voir dire that she might be biased toward the police because her husband was a state trooper, the district court immediately dismissed her, again in the presence of the jury pool. Third, the district court repeatedly asked every one of the prospective jurors whether they would be able to remain fair and impartial during the trial. *See Powell,* 932 F.2d at 1340–41. Finally, the jurors were instructed at the end of the trial that they were not to view the credibility of law-enforcement witnesses more favorably than other witnesses because of the officials' occupation. In *Gelb,* we found no abuse of discretion in failing to ask potential jurors about such bias in part because the "district court properly charged the jury in regard to assessing the credibility of law enforcement witnesses." 881 F.2d at 1165. We therefore conclude that the district court's conduct of the voir dire and the instructions given to the jury at the end of the presentation of evidence amply communicated the message that a prejudice or bias favoring the credibility of police, or anyone else for that matter, was inappropriate.

We note that our holding here is consistent with those of many other Circuits. *See, e.g., United States v. Cardales,* 168 F.3d 548, 556 (1st Cir.1999) ("We decline to adopt a rule requiring trial courts to make a routine inquiry into the possible bias all prospective jurors might have toward law enforcement testimony ....."); *Lancaster,* 96 F.3d at 738–44; *United States v. Lawrence,* 952 F.2d 1034, 1037 (8th Cir.1992); *United States v. Espinosa,* 771 F.2d 1382, 1404–05 (10th Cir.1985); *United States v. Nash,* 910 F.2d 749, 753–56 (11th Cir.1990).

### c) Cross–Examination of Bencivengo

Finally, appellant argues that the district court should not have barred him from cross-examining Bencivengo about his citation by the Civilian Complaint Review Board, which did not credit his testimony in that proceeding, for using excessive force against an arrestee in an unrelated case. Appellant contends that questioning Officer Bencivengo on this subject was important because it would have demonstrated Bencivengo's motive to lie about appellant's possession of a gun.

 "The scope and extent of cross-examination are generally within the sound discretion of the trial court, and the decision to restrict cross-examination will not be reversed absent an abuse of discretion." *United States v. Rosa,* 11 F.3d 315, 335 (2d Cir.1993). Exclusion of this evidence was not an abuse of discretion by the district court. The district court found that the risk of distraction resulting from appellant's intended interrogation substantially outweighed any probative value of the evidence. This was a valid application of Fed.R.Evid. 403. The proposed cross-examination was of little, if any, plausible relevance to Bencivengo's credibility. The Review Board's prior finding provides

nothing of value with respect to Bencivengo's motivation to lie about the circumstances of appellant's arrest in the present case. Indeed, Bencivengo played the lesser role in appellant's arrest. Rather, it was Martin who first spotted and became suspicious of appellant, thereafter inferred that appellant was armed, and acted to remove the gun from appellant's waistband.

## CONCLUSION

For the reasons indicated above, we affirm.

POOLER, Circuit Judge.

While I join in parts "a" and "c" of the majority's opinion, I respectfully dissent from part "b" because the district court's conduct in this case was an abuse of discretion. Although the government's evidence consisted solely of testimony from law enforcement officers, the district court failed to ask potential jurors about their bias in favor of or against these kinds of witnesses. The record contains no assurance that the district court reached the bias issue in another way. While I am reluctant to intrude on the district court's administration of voir dire, the district court's omission in this case had a crucial negative impact on defendant's constitutional right to an impartial jury. Contrary to the majority's characterization of the arguments on appeal, this is not a case about requiring blanket inquiries into witness bias or prescribed "must-ask" questions. I do not advocate that the trial judge was required to ask any particular questions—be they the defendant's proposed questions or even the government's proposed questions—about police bias. The problem is that the district court did not ask *any* question and left the potential for jury prejudice completely unexplored. If any set of facts presents an abuse of discretion in the administration of voir dire, it is this case.

In the specific context of a trial court's refusal to question potential jurors about possible bias in favor of law enforcement witnesses, the appellate court must consider "the importance of the government agent's testimony to the case as a whole; the extent to which the question concerning the venire-person's attitude toward government agents is covered in other questions on voir dire and on the charge to the jury; the extent to which the credibility of the government agent-witness is put into issue; and the extent to which the testimony of the government agent is corroborated by non-agent witnesses" in order to decide if reversal is warranted. *United States v. Gelb*, 881 F.2d 1155, 1164 (2d Cir.1989) (quoting *United States v. Baldwin*, 607 F.2d 1295, 1298 (9th Cir. 1979)). Application of this undisputed standard compels reversal.

The government's entire case rested on the testimony of four law enforcement officers, particularly the two arresting officers. The issue of pro-police bias therefore was critically important, which both parties recognized when they submitted proposed voir dire questions reaching the bias issue. The majority opinion glosses over the government's request to explore jurors' potential bias. The trial court's actual questioning merely concerned each juror's residence, occupation, prior jury service, and the employment of any other adult in the household. The district court also asked each juror the general questions, "Do you think you could be fair and impartial in this case?" and "Are you willing to serve?" Contrary to the majority's characterization, this questioning was inadequate. Defense counsel tried to convince the district court to "ask the jurors a couple of questions about their relationship to law enforcement or whether they have

any bias or prejudice ... [b]ecause this case is going to be entirely about the credibility of these police officers, and we are basically going to be saying they are not credible." The district court summarily rejected the proposal.

The majority holds that the district court's questions were adequate because two potential jurors revealed ties to law enforcement officers. The government especially relied on the trial court's attempt to ask one juror about her bias, but the exchange is, as defendant aptly describes it, "oblique and bizarre." After learning that a proposed juror lived in the same household as a Secret Service special agent, the district court initiated the following exchange:

THE COURT: Now, there will be people coming in here who are with law enforcement. Do you think because there is a person in your household that's also law enforcement that you might be biased towards them? Let me put it to you this way. Have you ever gotten a ticket?

JUROR: Yes.

THE COURT: Now, as the cop was walking away did you question whether his parents were actually married?

JUROR: No.

THE COURT: Could you recognize that people are people, no matter what they are?

JUROR: Yes.

THE COURT: Do you think you have any problem with that at all?

JUROR: No.

This colloquy between the district court and a single juror, which the majority chose not to quote fully in its discussion, did not clearly or directly address the bias issue. Moreover, the colloquy did not adequately convey the bias concern to the entire jury pool, which may or may not have been listening to the conversation.

In the second instance, a potential juror who lived in the same household as a New York State police officer openly admitted that she would be biased in favor of witnesses who were members of law enforcement. The trial court excused the potential juror on the spot. Again, it is highly unlikely and speculative whether this exchange, which took place in the second round of questioning, had any impact on the entire jury pool. Because the district court was addressing two jurors specifically, we cannot know if other jurors heard or considered the colloquies. The trial court's general questions also left out the possibility that a potential juror could have a pro-police bias because he or she knew but did not live with a member of law enforcement. The district court's general concluding question whether each juror "could be fair and impartial in this case" also failed to convey the specific concern regarding bias towards law enforcement officers.

The facts of this case are strikingly similar to *United States v. Contreras–Castro*, where the Ninth Circuit found that the district court abused its discretion during voir dire by failing to ask venire members if the testimony of law enforcement officers would unduly influence them. *United States v. Contreras–Castro*, 825 F.2d 185, 187 (9th Cir.1987). Like this case, the government's case in *Contreras–Castro* relied on the testimony of law enforcement officers and the court asked only general questions about impartiality and jurors' relationships with law enforcement officers. *Id.* The majority attempts to dismiss *Contreras–Castro* by saying that the Ninth Circuit has "made a career" of distinguishing it, but those later cases simply applied the same rule of law to different facts. And it is undisputed that the rule of law in

*Contreras–Castro* is consistent with the Second Circuit's rule in *Gelb.* We need look no further than *Gelb* to justify a reversal.

In *Gelb,* we held that any error in the court's failure to question jurors about the influence of official testimony was harmless because the court gave a credibility instruction concerning law enforcement witnesses and the testimony of the government agent witnesses was brief, not subject to "extensive challenge," and not the main source of incriminating evidence. *Gelb,* 881 F.2d at 1165. No circumstances are present here to assure us that the error in Lawes' trial was harmless. If anything, we are faced with the opposite situation from *Gelb:* the testimony of the law enforcement officers was the only evidence against defendant and accordingly subject to defendant's extensive challenge. The district court's meandering questioning of two potential jurors barely conveyed the bias issue to them, let alone the entire jury panel. The trial court's credibility instruction about law enforcement witnesses could not cure significant defects in the voir dire process.

The majority quotes articles from the New York Times in an attempt to establish that systemic bias favoring police does not exist in the Southern District of New York. The majority misses the point because no one is advocating a blanket rule here. Defendant asks only that we examine the facts of his trial. The majority also misunderstands the nature of prejudice in cases other than those reported on the front page of the New York Times: the day-to-day cases where the word of one black defendant is judged against the word of two police officers. No matter what happens in notorious cases, in mundane and unreported cases the police have more inherent credibility. Both defense counsel and the government recognized this reality before Martel Lawes' trial began, but the district court chose to ignore it to Lawes' detriment.