# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued January 12, 2006   Decided August 15, 2006

No. 05-3070

UNITED STATES OF AMERICA,
APPELLEE

v.

MATTHEW WEST, *A/K/A* TITUS SHACKLEFORD,
APPELLANT

---

Appeal from the United States District Court
for the District of Columbia
(No. 04cr00093-01)

---

*James W. Beane, Jr.*, appointed by the court, argued the cause and filed the briefs for appellant.

*Bernard J. Delia*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Kenneth L. Wainstein*, U.S. Attorney, and *Roy W. McLeese, III* and *Elizabeth Trosman*, Assistant U.S. Attorneys.

Before: TATEL, GARLAND, and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: A jury found defendant Matthew West guilty of unlawful possession of a firearm and ammunition by a convicted felon. West raises two issues on appeal. First, he argues that the district court's use of compound questions during voir dire denied him sufficient information to challenge prospective jurors for cause and impaired his ability to exercise his peremptory challenges intelligently. Second, he contends that the district court erred in failing to suppress evidence of the gun found in his bag. For the reasons set forth below, we affirm the judgment of conviction.

I

West was a passenger on a Greyhound bus traveling from New Jersey to North Carolina on February 2, 2004. During a brief stopover at the Greyhound terminal in Washington, D.C., officers from the Drug Interdiction Unit of the Metropolitan Police Department (MPD) boarded the bus and began questioning passengers. West was seated in the last row of the bus. Detective James McNamara -- who was wearing street clothes and did not display a weapon -- approached West, showed him his badge, and identified himself as an officer with the Drug Interdiction Unit. In a conversational tone, McNamara asked to see West's bus ticket. West handed over his ticket, which McNamara examined and returned. Next, McNamara inquired as to whether the bag at West's feet belonged to him and whether he had packed it himself. West answered "yes" to both questions. McNamara then asked to search the bag. West opened it and began moving items around so that the detective could see what was inside. McNamara then asked West for permission to search the bag himself to ensure his safety.

At this point, the recollections of Detective McNamara and defendant West diverge. At a pretrial hearing held to consider West's motion to suppress evidence, McNamara testified that

West told him he could search the bag, and that West then held the bag's flap back to allow the search. As the detective moved some clothing, he discovered a loaded revolver and placed West under arrest. By contrast, West testified that, although he opened the bag for the detective and "didn't mind going through it" for him, he "never told [McNamara] he [could] go through it." Suppression Hr'g Tr. 56 (May 5, 2004). After hearing the conflicting testimony, the district court concluded that West had consented to the search, that his consent was voluntary, and that evidence regarding the gun was therefore admissible at trial.

Jury selection commenced on September 29, 2004. Before voir dire began, the lawyers were given a list of the occupations that potential jurors had reported on their juror questionnaires. All but six potential jurors on the panel had listed their occupations.

The court conducted voir dire by asking the panel a series of twenty-nine questions. The questions had either one or two parts. In a one-part inquiry, the court simply asked the venire members an open-ended fact question, such as: Do you know any of the prospective trial witnesses (whom counsel had earlier listed)? The court instructed the panel members to raise their hands if the answer was "yes," and anyone who answered in the affirmative was called to the bench individually for further questioning to determine whether he or she could be fair and impartial despite that fact. Twenty-two of the court's twenty-nine questions were one-part inquiries.[1]

---

[1]Other one-part questions included whether any panel members: knew any of the trial lawyers or defendant West; were familiar with the facts of the case; were familiar with the immediate area where the offense took place; had opinions regarding defense attorneys or prosecutors that would cause them to favor one side or the other; or had any reason at all that would cause them to be unable to sit fairly

The court asked the remaining seven questions in two-part, compound form. The first part of the question was again a fact question, for example: Are or were you, or your close personal friends or family members, employed by a law enforcement agency? The second part of each question was: Would that fact make you unable to be fair and impartial to both sides? The judge told the prospective jurors that, regardless of their answer to the first part (the fact question), they were not to raise their hands or say anything unless their answer to the second part (the unable to be fair and impartial question) was "yes." Only then would they be called to the bench for individual voir dire. There were six other two-part questions, including a similar compound inquiry regarding current or previous employment in criminal defense.[2]

West's counsel objected to the court's use of compound questions, arguing that it deprived him of "the opportunity to ferret out possible bias." Trial Tr. 57 (Sept. 29, 2004). The prosecutor joined defense counsel's objection, stating that she "agree[d] that jurors should not be responsible for drawing their own conclusions about what makes them fair and impartial." *Id.* at 58. The court rejected the lawyers' objections, explaining that

---

and impartially. The court also asked whether any panel members, or their close friends or family, had: had an experience that would cause them to give greater or lesser weight to a police officer's testimony; been a victim of, a witness to, or charged with, an offense like that at issue in the case; or, as a result of having been a victim of, a witness to, or charged with a crime, could not be fair and impartial to both sides.

[2]The court also asked two-part questions about whether the panel members: were acquainted with other panel members; were currently studying or had previously studied law; had previously served as jurors; had previously served as grand jurors; or were currently or previously involved in crime prevention groups.

the court "place[d] a very high premium on these jurors abiding by their oath," that "[j]ury selection in this district as it is takes hours," and that "[i]f we attenuate this further, what now takes . . . three hours to pick a jury will be six to seven hours." *Id*. at 61-62. Selection of the jury concluded after approximately three hours and the jurors, including two alternates, were sworn.

Before trial began the next day, defense counsel noted a further objection for the record, stating that he had been forced to use peremptory challenges on five potential jurors because he "knew nothing about their level of potential bias." Trial Tr. 9 (Sept. 30, 2004). Those five included an attorney with the Federal Bureau of Investigation (FBI), an attorney with the Department of Justice, a security officer, and two individuals who did not list any employment on their juror questionnaires.

The government called Detective McNamara as its first witness. Almost immediately after the detective began testifying, a juror raised his hand and informed the court that he knew the witness. The court excused the rest of the jury and called the juror to the bench, where the juror informed the court that he was an Amtrak conductor and had helped McNamara and his drug interdiction team take passengers who were being arrested off of trains. In response to questioning from the court, the juror stated that, as a result of this experience, he did not believe he could remain fair and impartial. The court excused the juror and seated an alternate in his place. Detective McNamara then continued his testimony.

McNamara's trial testimony largely repeated his testimony at the suppression hearing. During its course, McNamara mentioned that a sergeant in the Drug Interdiction Unit -- Brian Murphy -- was with him on the bus on the day of West's arrest. Sergeant Murphy (who was not otherwise involved in the case) was not a trial witness; hence, his name, unlike McNamara's,

had not been read to the jury pool. Before the second day of trial began, a juror approached the court to say that she thought she knew Sergeant Murphy. The juror said that Murphy had once dated a friend of hers, but that she had not seen the sergeant in three years. The juror stated that she had asked another friend -- an MPD detective who had worked on undercover narcotics cases with Murphy -- for confirmation that the Sergeant Brian Murphy mentioned at trial was the same Sergeant Brian Murphy she knew. In response to questioning by the court about her relationship with the MPD detective, the juror said that they were "[p]latonic friend[s]," that they had been "tight for four or five years," but that they had "grown apart in the last year." Trial Tr. 8 (Oct. 1, 2004). The court asked the juror whether there was anything about her prior interactions with Sergeant Murphy or with her detective friend that would render her unable to be fair and impartial to both sides in the case. The juror attested to her ability to remain fair and impartial.

The defense moved to excuse this second juror for cause. The court denied the motion, finding that the juror had said nothing to indicate any bias, and that her relationships with Sergeant Murphy and the detective were insufficient to warrant a for-cause strike. Defense counsel again moved to excuse the juror, arguing that the voir dire process had been flawed and that seating the alternate would remedy the problem. Defense counsel maintained that, had the court not used a compound question, he would have known about the juror's friendship with an MPD detective and would have exercised a peremptory challenge against her. The court rejected this argument, finding it speculative that the juror would have regarded the detective, from whom she had grown apart, as a "close personal friend" (as called for by the first part of the compound question). *Id*. at 15-16.

The trial concluded on the second day. West did not testify, nor did he present any witnesses or evidence on his behalf. His sole defense, offered during counsel's closing argument, was that he did not have constructive possession of the gun because he did not intend to possess it at the time he was arrested. After deliberating less than an hour, the jury returned a guilty verdict.

On this appeal, West challenges both the district court's method of conducting the voir dire and its denial of his motion to suppress the gun. We consider the former in Part II and the latter in Part III.

II

West's objections to the voir dire are aimed at the district court's practice of asking certain questions using the two-part, compound format described above. Although at oral argument West contended that his objection extended to "the entire voir dire process," Oral Arg. Tape at 2:21, he conceded that his briefs focused only on the possible law enforcement bias of potential jurors arising from employment by a law enforcement agency or close association with law enforcement officers, *see id*. at 5:49. The only question he objected to on this score was the compound question that asked the prospective jurors whether they, or their close personal friends or family members, were currently or previously employed by a law enforcement agency -- but that precluded an affirmative response unless a prospective juror believed that he or she "would be unable to be fair and impartial to both sides . . . as a result of that experience." Trial Tr. 49 (Sept. 29, 2004). None of the panel members raised their hands at the end of this two-part question.

West charges that, due to the way in which the court structured this question, he never learned whether any of the potential jurors, or their close friends or family, were currently

or previously employed by law enforcement. He contends that this was error for two reasons: the court's method denied him sufficient information to challenge prospective jurors for cause, and it impaired his ability to exercise his peremptory challenges intelligently.

West's critique parallels the Supreme Court's explanation that "[v]oir dire examination serves the dual purposes of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges." *Mu'Min v. Virginia*, 500 U.S. 415, 431 (1991) (italics omitted); *see Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981). As this court has recognized, "[w]ithout knowledge bearing on the qualifications of the veniremen, neither function can be performed intelligently." *United States v. Peterson*, 483 F.2d 1222, 1226-27 (D.C. Cir. 1973). We consider West's two arguments below.

## A

"Because the obligation to impanel an impartial jury lies in the first instance with the trial judge, . . . . federal judges have been accorded ample discretion in determining how best to conduct the voir dire." *Rosales-Lopez*, 451 U.S. at 189 (italics omitted). That discretion extends to the "mode and manner of proceeding," as well as "to the range of questions put to the prospective jurors." *United States v. Robinson*, 475 F.2d 376, 380 (D.C. Cir. 1973); *see United States v. Orenuga*, 430 F.3d 1158, 1162 (D.C. Cir. 2005). The voir dire process is governed by Federal Rule of Criminal Procedure 24(a), which leaves its conduct largely up to the trial judge:

> (1) In General. The court may examine prospective jurors or may permit the attorneys for the parties to do so.

(2) Court Examination. If the court examines the jurors, it must permit the attorneys for the parties to: (A) ask further questions *that the court considers proper*; or (B) submit further questions *that the court may ask if it considers them proper.*

FED. R. CRIM. P. 24(a) (emphasis added). As the Rule makes clear, "federal trial judges are not required to ask every question that counsel -- even all counsel -- believes is appropriate." *United States v. Lawes*, 292 F.3d 123, 128 (2d Cir. 2002).

Although the district court has broad discretion, "[t]he exercise of this discretion, and the restriction upon inquiries at the request of counsel, [remain] subject to the essential demands of fairness." *Aldridge v. United States*, 283 U.S. 308, 310 (1931); *see Peterson*, 483 F.2d at 1227; *Robinson*, 475 F.2d at 380. Defense counsel "always 'must be given a full and fair opportunity to expose bias or prejudice on the part of the veniremen.'" *Orenuga*, 430 F.3d at 1163 (quoting *Robinson*, 475 F.2d at 380-81). As the Supreme Court has emphasized, "[w]ithout an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Rosales-Lopez*, 451 U.S. at 188 (italics omitted); *see United States v. Edmond*, 52 F.3d 1080, 1094 (D.C. Cir. 1995).

We have described the appropriate standard of appellate review for challenges to a trial court's voir dire many times. Under that standard, "absent abuse of [the court's] broad discretion, *and* a showing that the rights of the accused have been substantially prejudiced thereby, the trial judge's rulings as to the scope and content of voir dire will not be disturbed on appeal." *Robinson*, 475 F.2d at 380 (emphasis added); *accord Edmond*, 52 F.3d at 1095; *United States v. Washington*, 705 F.2d

489, 495 (D.C. Cir. 1983); *United States v. Caldwell*, 543 F.2d 1333, 1345 (D.C. Cir. 1975); *United States v. Liddy*, 509 F.2d 428, 434-35 (D.C. Cir. 1974). For the following reasons, we find that there was neither an abuse of discretion nor a showing that the defendant's rights were substantially prejudiced in this case.

1. On the question of whether the district court abused its discretion, we conclude that the voir dire did not leave the defendant with insufficient information to enable him to challenge for cause any juror who was biased against him.

First, West's claim that he could not ascertain the panel members' own current ties to law enforcement is not entirely accurate. The parties were given a list of the venire that included the occupations of all but six of the potential jurors. Of those six, four were over sixty-seven years old -- justifying the district court's inference that they likely were retired -- and the remaining two were struck during the voir dire. *See* Trial Tr. 11, 20 (Sept. 30, 2004). West therefore had current employment information for almost all of the potential jurors. And while it is true that neither the list nor the employment question (because of its compound structure) ensured that West would learn of panel members' (or their close friends' or families') previous employment in law enforcement, West never requested the kind of narrower question (for example, a question specifically about employment with the MPD) that the court might have been required to ask. *See infra* Part II.C.

Second, the voir dire provided West with additional opportunities to learn of law enforcement experience, or law enforcement bias, on the part of the panel. As noted in Part I, the court asked a total of twenty-nine questions, twenty-two of which were one-part questions that did not have the defect West has identified. *See supra* note 1. Among those was the

question: "As a result of an experience that you either had personally or a close family member . . . or a close personal friend had[,] . . . would [you] be likely to give greater or lesser weight to a police officer's testimony just because they are a police officer?" Trial Tr. 34 (Sept. 29, 2004). The court also asked whether any member of the panel, or any panel member's close family or friend, had ever been "a victim of, a witness to, charged with, [or] arrested for a similar type of offense as the one charged in this case." *Id.* at 69. Other open-ended, one-part questions included whether any panel member knew the prosecutor, the defense attorney, the defendant, or any of the potential trial witnesses. And the court closed its questioning by asking what it called the "kitchen sink" question, inviting individual panel members to come forward if there was "any reason that you can think of, even though we haven't covered it in a question, that you believe is a basis for your inability to sit fairly, attentively, and impartially if selected as a juror." *Id.* at 80. As we have previously said, this kind of general inquiry about potential bias is important because it "call[s] upon each prospective juror, on his oath, to respond if he [feels] that any aspect of the case . . . might affect his impartiality." *Peterson*, 483 F.2d at 1228. Thus, West was not denied an inquiry into the subject of potential law enforcement bias.[3]

Third, and perhaps most important, the scope required of appropriate voir dire necessarily depends on the facts and circumstances of the particular case. Questions that probe a potential juror's views of the credibility of certain kinds of witnesses, for example, are more important in some cases than others. Here, as West's counsel conceded at oral argument, the

---

[3]*Cf. Butler v. City of Camden*, 352 F.3d 811, 816 (3d Cir. 2003) (noting that the Third Circuit has "found error and reversed in cases where the district court barred all inquiry into a relevant *subject matter* designed to elicit a disqualifying prejudice").

credibility of the police witnesses was not at issue at trial. *See* Oral Arg. Tape at 8:27-:50. The defense did not dispute Detective McNamara's trial testimony that the bag at West's feet contained a loaded revolver, or that West said that the bag was his and that he had packed it himself. West's sole defense was that he did not have constructive possession of the gun because he did not intend to possess it. *See* Trial Tr. 83-87 (Oct. 1, 2004) (defense counsel's closing argument). *Compare United States v. Gelb*, 881 F.2d 1155, 1165 (2d Cir. 1989) (finding no reversible error in the court's failure to ask about potential law enforcement bias when "the credibility of most of the official witnesses was not subject to extensive challenge"), *with Brown v. United States*, 338 F.2d 543, 545 (D.C. Cir. 1964) (vacating a conviction where the prosecution's case depended on the credibility of its law enforcement witnesses and the court refused to ask whether potential jurors would give greater credence to the testimony of law enforcement officers).

Considering all of these factors together, we conclude that the voir dire in this case met the "the essential demands of fairness." *Aldridge*, 283 U.S. at 310. The court's questioning, considered as a whole, provided the defendant with sufficient information to enable him to challenge for cause any juror who might be biased against him.

2. On the question of whether -- even if the district court had abused its discretion -- West suffered substantial prejudice, we note the following circumstances in addition to those considered above.

First, the court asked numerous questions, of both the one- and two-part variety, that required the potential jurors to swear that they could be fair and impartial. Particularly important in this regard was the one-part, "kitchen sink" question noted above. In addition, at the conclusion of the case, the court

expressly instructed the jurors that "[i]n no event" were they to give "either greater or lesser weight to the testimony of a witness merely because he is . . . a police officer." Trial Tr. 101 (Oct. 1, 2004). Given that West did not challenge the credibility of the law enforcement witnesses, those questions and that instruction served to mitigate any potential prejudice. *Cf. Peterson*, 483 F.2d at 1228 ("perceiv[ing] no prejudice resultant from the denial" of the defendant's specific voir dire request because, inter alia, the court instructed the jury against improper inferences and "posed a general question that should have elicited instances of bias, if any at all existed").

Second, the government's case against West can aptly be described as overwhelming. As just noted, West did not dispute any part of Detective McNamara's testimony. His only defense was that he did not intend to possess the gun. Since West did not testify -- about his intent or any other topic -- there was little if anything to this defense. *See United States v. Victoria-Peguero*, 920 F.2d 77, 85 (1st Cir. 1990) (refusing to reverse a defendant's conviction, despite the district court's error in not inquiring about law enforcement bias, in part because "the government's case was very strong").

Finally, and critically, West does not allege that any juror who sat on his case was actually biased against him. *See United States v. Haldeman*, 559 F.2d 31, 70-71 (D.C. Cir. 1976). Nor can we presume that a juror's "connections to law enforcement . . . , standing alone," are "suffic[ient] to establish implied bias." *United States v. Morales*, 185 F.3d 74, 84 (2d Cir. 1999). Indeed, we have held that, "absent a specific showing of bias, [even] a defendant accused of murdering a police officer is not entitled to a jury free of policemen's relatives." *Caldwell*, 543 F.2d at 1347. The court removed the juror (the Amtrak conductor) who said he knew Detective McNamara and could not be impartial, and it individually questioned the juror who

came forward to say she knew Sergeant Murphy. As to this second juror, the court concluded, after careful questioning, that she could remain fair and impartial -- a finding that West does not challenge on appeal.

In sum, considering the totality of the circumstances, we conclude that, even if the court had erred in posing the law enforcement employment question in compound form, there is no "showing that the right[] of the accused" to an impartial jury has "been substantially prejudiced thereby." *Robinson*, 475 F.2d at 380.[4]

B

West also argues that the district court's voir dire impaired his ability to exercise his peremptory challenges intelligently. While "[t]he peremptory challenge is part of our common-law heritage[,]" it is "not of federal constitutional dimension." *United States v. Martinez-Salazar*, 528 U.S. 304, 311 (2000); *see Ross v. Oklahoma*, 487 U.S. 81, 88 (1988). Rather, in state cases it is a "creature of statute," *Ross,* 487 U.S. at 89, and in federal cases a creature of Rule 24(b), which specifies the number of peremptories to which each side is entitled, *see* FED. R. CRIM. P. 24(b). Without defining the exact contours of the

---

[4] *See Victoria-Peguero*, 920 F.2d at 84-85 (holding that whether error in failing to ask a question about bias in favor of law enforcement testimony requires reversal "hinges on such factors as the importance of the government agent's testimony to the case as a whole; the extent to which the question concerning the venire person's attitude toward government agents is covered in other questions . . . ; the extent to which the credibility of the government agent-witness is put into issue; and the extent to which the testimony of the government agent is corroborated by non-agent witnesses" (internal quotation marks and citation omitted)).

right, we have held that there "'must be sufficient information elicited on voir dire to permit a defendant to intelligently exercise . . . his peremptory challenges.'" *Edmond*, 52 F.3d at 1090 (quoting *United States v. Barnes*, 604 F.2d 121, 142 (2d Cir. 1979)).

Although West points us to the Supreme Court's suggestion in *Swain v. Alabama* that "[t]he denial or impairment of the right [to peremptory challenges] is reversible error without a showing of prejudice," 380 U.S. 202, 219 (1965), he fails to mention the Court's subsequent retreat from that suggestion. In *United States v. Martinez-Salazar*, while finding it unnecessary to decide "what the appropriate remedy for a substantial impairment would be," the Court sharply observed that this "oft-quoted language in *Swain* was not only unnecessary to the decision in that case[,] . . . but was founded on a series of our early cases decided long before the adoption of harmless-error review." 528 U.S. at 317 n.4. We need not decide whether the substantial impairment of a defendant's right to peremptory challenges requires automatic reversal, because we conclude that West's right was not substantially impaired. As we have discussed above, West had adequate -- albeit imperfect -- information with which to exercise his peremptory challenges.[5]

---

[5]In the interim between *Swain* and *Martinez-Salazar*, other circuits held that the denial or impairment of a litigant's right to peremptory challenges required automatic reversal. In no case, however, did a court hold that a litigant's rights were substantially impaired because of an inadequate voir dire. *Cf., e.g., Carr v. Watts*, 597 F.2d 830, 833 (2d Cir. 1979) (finding reversible impairment where a judge's practice of refusing to allow counsel to carry over unused peremptory challenges prevented the litigant "from using his remaining peremptory challenge which was his as a matter of statutory right"); *United States v. Ricks*, 776 F.2d 455, 461 (4th Cir. 1985) (finding reversible impairment where confusion about the order in which jurors would be selected rendered the defendant's peremptory

The examples that West cites in support of his impairment argument do not establish impairment at all. The failure of the first juror, the Amtrak conductor, to disclose his acquaintance with Detective McNamara was not the consequence of the district court's mode of questioning. On the one hand, it is unlikely that the conductor would have answered "yes" even if the employment question had been asked in one part, since the conductor was not employed by a law enforcement agency. On the other hand, the conductor should have answered "yes" to a one-part question that the district court did ask: whether any member of the panel knew any of the prospective witnesses, specifically including Detective McNamara.[6]

Nor has West shown that breaking the employment inquiry into two separate questions would have elicited an affirmative response from the second juror (the one with the friend who was a detective). The first part of that question asked whether any of the prospective jurors, or their *close* personal friends or family members, were employed by a law enforcement agency. But this juror testified that she had "grown apart" from her detective friend, suggesting -- as the district court said -- that she did not regard their current relationship as "close." Trial Tr. 8, 15-16 (Oct. 1, 2004). Because West objected only to the compound structure of the question, and not to its restriction to "close" friends, there is little support for his claim that a different mode of questioning would have given him more timely information about that juror.

---

strikes "worthless because they were all exercised with respect to veniremen who were not considered for selection as jurors").

[6]In light of his subsequent statement that he could not be fair and impartial, the conductor also should have answered "yes" to the court's one-part "kitchen sink" question. Trial Tr. 80 (Sept. 29, 2004).

Finally, West notes in the introductory portion of his brief -- but not in the argument section -- that he "was forced to use peremptory challenges on five jurors" who might otherwise have been struck for cause, "because he did not have sufficient knowledge to appropriately judge the level of their potential bias." Appellant's Br. 12. According to their juror questionnaires, one of the five was an FBI attorney, one was a Department of Justice attorney, one was a security officer, and two listed no employment at all. *See* Trial Tr. 9-20 (Sept. 30, 2004). No doubt the reason West does not argue this point is that the Supreme Court has foreclosed it. *See Martinez-Salazar*, 528 U.S. at 307 (holding that "a defendant's exercise of peremptory challenges . . . is not denied or impaired when the defendant chooses to use a peremptory challenge to remove a juror who should have been excused for cause").

C

Although we affirm West's conviction, our decision should not be taken as endorsing the use of compound questions with respect to subjects of substantial import in a particular case. The district court's discretion regarding voir dire is broad, but it is not boundless. The problem with using compound questions, as West correctly notes, is that it prevents the parties from learning the factual premise of the first part of the question, relying instead upon the juror's self-assessment of his or her impartiality. Yet, as we have cautioned in the past, "'whether a juror can render a verdict based solely on evidence adduced in the courtroom should not be adjudged on that juror's own assessment of self-righteousness without something more.'" *Edmond*, 52 F.3d at 1097 (quoting *Silverthorne v. United States*, 400 F.2d 627, 639 (9th Cir. 1968) (alteration omitted)).[7]

---

[7]As Chief Justice Marshall said at the trial of Aaron Burr: "[A] man . . . may declare that he feels no prejudice in the case; and yet the

This is not just a problem for the defense. Here, for example, the district court treated both sides even-handedly. Another compound question that it put to the venire was whether they, or their close friends or family, were "involved in any way in the defense of criminal cases." Trial Tr. 49 (Sept. 29, 2004). As with the law enforcement employment question, the court told the potential jurors not to answer unless they could not be "fair and impartial to both sides." *Id*. It is thus unsurprising that the prosecutor joined defense counsel in objecting to the use of compound questions, stating that the government "agree[d] that jurors should not be responsible for drawing their own conclusions about what makes them fair and impartial," *id*. at 58, and that this was "not a sufficient voir dire process to allow the attorneys to exercise their peremptories with any information about who we have in the pool," Trial Tr. 24 (Sept. 30, 2004).

We do not suggest that the trial court must use one-part questions on every subject, in every case. Whether and which one-part questions are required depends upon the context. Nonetheless, "[u]ndoubtedly there are occasions upon which further questioning is needed to permit the trial court to make its own judgment of a juror's impartiality based on objective facts, rather than relying exclusively on the jurors' subjective determinations of whether they [are] prejudiced." *Caldwell*, 543 F.2d at 1345. As we have said several times, "'[t]he possibility of prejudice is real, and there is consequent need for a searching voir dire examination, in situations where, for example, the case carries racial overtones, or involves other matters concerning which either the local community or the population at large is commonly known to harbor strong feelings that may stop short

---

law cautiously incapacitates him from serving on the jury because it suspects prejudice, because in general persons in a similar situation would feel prejudice." *United States v. Burr*, 25 F. Cas. 49, 50 (No. 14,692) (C.C. Va. 1807).

of presumptive bias in law yet significantly skew deliberations in fact.'" *Orenuga*, 430 F.3d at 1163 (quoting *Robinson*, 475 F.2d at 381 (footnotes omitted)); *see also Mu'Min*, 500 U.S. at 424; *Rosales-Lopez*, 451 U.S. at 189. In addition, "voir dire must be allowed on subjects with respect to which 'bias and distorting influence have become evident, through experience with juries, and have come to be recognized as a proper subject for the voir dire.'" *Orenuga*, 430 F.3d at 1163 (quoting *Robinson*, 475 F.2d at 381 (italics omitted)). This circuit has held that "[t]he potential for jurors to attach undue weight to the testimony of law enforcement officials during trial is one such example." *Orenuga*, 430 F.3d at 1163 (citing *Robinson*, 475 F.2d at 381 (citing *Brown*, 338 F.2d at 544)).[8]

Another example is the problem of pretrial publicity, as to which this circuit has expressly disapproved the kind of compound questions asked in this case. In *United States v. Edmond*, the district court did not ask prospective jurors whether they had been exposed to pretrial publicity, but only whether those who had been exposed could "render a fair and impartial verdict." 52 F.3d at 1096, 1097. We identified the defect in this approach as follows:

> This style of questioning hardly commends itself. The trial judge's inquiry failed to ask directly whether prospective jurors had been exposed to pretrial publicity; instead, the judge conflated that question with the broader inquiry whether, notwithstanding their presumed exposure to such publicity, they could render a verdict based solely on the evidence adduced at trial.

---

[8]In the instant case, the district court followed this precedent, asking the potential jurors, in one-part form, whether they "would be inclined to give greater or lesser weight to a police officer's testimony just because they are a police officer." Trial Tr. 34 (Sept. 29, 2004).

> Not only does such questioning confuse the two lines of inquiry, but it allows jurors to assess their own impartiality before the court even has determined the extent of their exposure to the media. Indeed, this latter flaw alone can rise to the level of reversible error in cases where extreme pretrial publicity has inflamed the local community against the defendants.

*Id*. at 1097. In the end, we did not reverse the defendants' convictions, but only because we found that, "in the totality of the circumstances," the voir dire "was adequate to assure the impaneling of a jury that could render a judgment based solely on the evidence adduced at trial." *Id*. at 1098-99. Those circumstances included the fact that "the [d]istrict [c]ourt began voir dire in th[e] case by asking prospective jurors to fill out 20-page questionnaires . . . [that] asked about [their] exposure to various media, inquiring as to the newspapers and television programs most regularly read and viewed by each juror." *Id*. at 1096.[9]

Finally, and directly relevant here, in certain circumstances a more searching voir dire may be required with respect to a prospective juror's employment. In *United States v. Segal*, for example, the court vacated the defendants' convictions for

---

[9]*See United States v. Beckner*, 69 F.3d 1290, 1293-95 (5th Cir. 1995) (reversing a defendant's conviction and remanding for a new trial where the district court "did not ask jurors what information they had read" about the case, but only whether "anyone had been so affected by pretrial publicity that he or she could not be completely fair and impartial"); *Silverthorne*, 400 F.2d at 638-39 (requiring a new trial in a case of pervasive pretrial publicity because the "trial court made no effort to ascertain what information the jurors had accumulated," but merely went "through the form of obtaining jurors assurances of impartiality" (internal quotation marks and citation omitted)).

bribing an Internal Revenue Service (IRS) agent, because the district court had refused to ask whether any prospective jurors or their immediate families worked for the IRS.  *See Segal*, 534 F.2d 578, 581 (3d Cir. 1976), *cited with approval in Butler v. City of Camden*, 352 F.3d 811, 816-17 (3d Cir. 2003).  The Third Circuit held:

> [T]he defendants would reasonably need to know whether any member of the panel or any person in his family had ever been employed by the Internal Revenue Service.  The possibility of lingering loyalty to the service, friendship of persons still employed there, or knowledge of agency procedures are all factors which counsel would weigh in deciding whether to challenge. . . .  [P]ast employment by the specific agency prosecuting the case is a matter which should be explored upon a party's request.  The refusal to do so requires that a new trial be granted.

*Segal*, 534 F.2d at 581.[10]  The analogous one-part question here would have been whether prospective jurors or their families had ever been employed by the MPD, or worked in drug interdiction.  By contrast, the compound question that the court did ask required even an MPD narcotics officer to remain silent if he thought he could be fair and impartial.  Had the defendant requested, and the district court refused to ask, such a one-part question, this would have been a much closer case.  We need not

---

[10]*Cf. Lawes*, 292 F.3d at 131 (finding no error because, although the court refused to ask whether prospective jurors had relationships or friendships with law enforcement officers, the questions that were "asked would reveal whether the potential juror or a member of the juror's household was in law enforcement, the most compelling circumstances with regard to the need for further inquiry").

reach that issue, however, because West never sought such a narrowed inquiry.

We are not unsympathetic to the desire of district courts to control their crowded dockets. But, as the government confirmed at oral argument, in this jurisdiction questions regarding a prospective juror's employment by law enforcement agencies or criminal defense attorneys are typically asked as one-part questions. *See* Oral Arg. Tape at 31:10.[11] Such questions do not unduly extend the duration of voir dire. Certainly nothing prevents the court from requiring the parties to prioritize their requests, narrowing the number and scope of questions that they wish to have asked on a one-part basis.

We repeat that we find no error, reversible or otherwise, in the district court's conduct of voir dire. Nonetheless, we reiterate the caution of *Edmond* that "our approval of the trial court's actions is inextricably linked to the particular circumstances of this case." 52 F.3d at 1099. "We caution trial judges not to test the outer limits of their discretion" and, "[i]n particular, . . . to avoid asking compound questions of prospective jurors." *Id*. As we said in *Edmond*, "[w]here a defendant's constitutional right to a fair trial is at stake, the better practice is to err on the side of a voir dire that is simple, direct, and thorough." *Id*.

---

[11]This also appears to be the case in other circuits. *See, e.g.*, *Lawes*, 292 F.3d at 131 (noting that the district court's questions "reveal[ed] whether the potential juror or a member of the juror's household was in law enforcement"); *United States v. Nash*, 910 F.2d 749, 754 (11th Cir. 1990) (noting that the district court "asked the veniremen whether they, their friends, or their family were employed in law enforcement").

III

West's second challenge is to the district court's denial of his motion to suppress the gun found in his bag. "In reviewing the denial of a motion to suppress, we examine the district court's legal conclusions de novo, but apply a clearly erroneous standard to its underlying findings of fact." *United States v. Pindell*, 336 F.3d 1049, 1052 (D.C. Cir. 2003) (internal quotation marks omitted). West's suppression argument is two-pronged: First, he argues that he was unlawfully seized when Detective McNamara "began interrogating him," which in turn tainted the subsequent search of his bag. Appellant's Br. 29. Second, he argues that he did not voluntarily consent -- or consent at all -- to that search.

The premise of West's seizure claim is that, in the close confines of the bus, he did not believe he could simply ignore the detective's questioning. As the Supreme Court has said, however, the "fact that an encounter takes place on a bus does not on its own transform standard police questioning of citizens into an illegal seizure." *United States v. Drayton*, 536 U.S. 194, 204 (2002). Rather, the "proper inquiry 'is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.'" *Id.* at 202 (quoting *Florida v. Bostick*, 501 U.S. 429, 436 (1991)). The facts of this case are virtually indistinguishable from those of *Drayton*, and completely indistinguishable from those of *United States v. Lewis*, 921 F.2d 1294 (D.C. Cir. 1990). In the latter, we held that the questioning of a defendant on a bus did not constitute a seizure where the officer wore plain clothes, spoke in a conversational tone, did not display a weapon, and returned the defendant's ticket after examining it. *See id.* at 1296-99. Indeed, it is a mark of the futility of West's argument that a principal case on which he relies, *United States v. Cothran*, 729

F. Supp. 153 (D.D.C. 1990), was overturned on appeal in *Lewis*, 921 F.2d at 1300.

We turn next "from the question whether [the defendant was] seized to whether [he was] subjected to an unreasonable search, *i.e.*, whether [his] consent to the suspicionless search was involuntary." *Drayton*, 536 U.S. at 206. West testified that he never gave McNamara permission to personally search the bag at all. But McNamara testified that West did give him such permission, and the district court's "finding that this permission was given, based on demeanor and credibility evidence, cannot be said to be clearly erroneous." *United States v. Brady*, 842 F.2d 1313, 1315 (D.C. Cir. 1988). With respect to the voluntariness of that consent, in "circumstances such as these, where the question of voluntariness pervades both the search and seizure inquiries, the respective analyses turn on very similar facts." *Drayton*, 536 U.S. at 206. And just as the Supreme Court said in *Drayton*: "[T]he facts above suggest [that defendant's] consent to the search of [his] luggage . . . . was voluntary. Nothing [the detective] said indicated a command to consent to the search." *Id*. Rather, when West told McNamara that the bag was his, the detective "asked for [his] permission to check it[,] . . . indicating to a reasonable person that he or she was free to refuse." *Id*.

We therefore conclude that there was no Fourth Amendment violation and that the evidence regarding the gun was properly admitted at trial.

25

IV

Finding no error in the district court's conduct of voir dire or in its refusal to suppress evidence, we affirm the judgment of conviction.

*Affirmed.*