# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

————

Argued September 13, 2005          Decided December 2, 2005

No. 04-3083

UNITED STATES OF AMERICA,
APPELLEE

v.

OBAFEMI ORENUGA,
APPELLANT

————

Consolidated with
04-3089

————

Appeals from the United States District Court
for the District of Columbia
(No. 03cr00464-01)

————

*Edward C. Sussman*, appointed by the court, argued the cause and filed the brief for appellant.

*Suzanne G. Curt*, Assistant U.S. Attorney, argued the cause for appellee.  On the brief were *Kenneth L. Wainstein*, U.S. Attorney, and *John R. Fisher*, Assistant U.S. Attorney at the time the brief was filed, *Julieanne Himelstein, Lisa O. Monaco*, and *Mary B. McCord*, Assistant U.S. Attorneys.  *Thomas J. Tourish, Jr.*, Assistant U.S. Attorney, entered an appearance.

Before: GINSBURG, *Chief Judge*, TATEL, *Circuit Judge*, and EDWARDS, *Senior Circuit Judge*.[*]

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*:  Defendant-appellant Obafemi Orenuga, a former tax auditor in the District of Columbia Office of Tax and Revenue ("OTR"), was convicted after a five-day jury trial on two counts of receipt of a bribe by a public official in violation of 18 U.S.C. § 201(b)(2)(A) (2000). On appeal, appellant seeks reversal and a remand for a new trial, asserting that the District Court erred when it (1) denied him the right to question prospective jurors on the entrapment defense in violation of the Sixth Amendment, (2) admitted a prejudicial portion of a videotape used as evidence by the Government, and (3) found that conviction for bribery under 18 U.S.C. § 201(b)(2)(A) requires acceptance of the bribe, but not performance of the illegal promise.  We find no merit in appellant's claims.  We therefore affirm the judgment of the District Court.

## I. BACKGROUND

Orenuga was employed as a tax auditor for OTR and its predecessor, the Department of Finance and Revenue, from 1995 to 2003.  He was principally responsible for auditing businesses that were believed to have either failed to pay or underpaid sales taxes owed to the District of Columbia.  This case arises out of Orenuga's assignment to audit Bestway Liquors ("Bestway") in 2001.  During this audit, Orenuga was recorded by the Federal Bureau of Investigation ("FBI") on audio and video tapes accepting money as part of an agreement to unlawfully reduce the tax liability of two local businesses.

---

[*] Senior Circuit Judge Edwards was in regular active service at the time of oral argument.

The parties' accounts of the events leading to the unlawful relationship differ, although not in ways that materially affect our analysis. Broadly, Orenuga testified that after being assigned the Bestway audit, he received only limited cooperation from Bestway's owner, Fikerte Yemane, and her independent representatives, Mohammed Mobaidin and Connie Meyers. According to Orenuga, compliance with his document requests was not forthcoming until after he sent Yemane a $70,000 "jeopardy assessment" – an assessment based on incomplete information designed to get the auditee's attention. Following the jeopardy assessment, Mobaidin served as the main contact for Bestway and submitted most of the requested information. Orenuga claimed to be uncomfortable working with Mobaidin, however, as Mobaidin allegedly hounded Orenuga about his personal and family interests and repeatedly chastised him for acting "like a cop." Trial Transcript ("Tr.") at 114-18 (4/7/04). Orenuga testified that Mobaidin eventually offered him an illicit payment if he would lower Bestway's tax liability.

The Government's case was presented largely through the testimony of Mobaidin, who assisted the FBI with its investigation. Mobaidin suggested that he and Meyers initially shared the audit responsibilities and promptly responded to each of Orenuga's information requests. He also testified that, in his first few meetings with Orenuga, he was surprised by how little attention Orenuga gave to the information that was provided on behalf of Bestway. In June 2002, after Meyers stopped working on the Bestway account, Orenuga allegedly informed Mobaidin that Bestway owed $70,000 in taxes, but remarked, "If you take care of me, I take care of [Yemane]." Tr. at 70 (4/6/04). According to Mobaidin, Orenuga then wrote down on a piece of paper that he wanted $8,000 for himself and $12,000 for OTR (the latter to avoid the appearance of impropriety). This offer is allegedly what led Mobaidin to contact FBI Special Agent Mary

Jo Ervin, for whom Mobaidin had previously served as an informant.

What transpired from this point forward is largely undisputed. Upon learning from Mobaidin about Orenuga's alleged proposal, Special Agent Ervin sought Mobaidin's continued cooperation. Mobaidin was provided with equipment to record his future meetings and phone calls with Orenuga. In exchange for Mobaidin's assistance, Special Agent Ervin aided him in his pending Immigration and Naturalization Service deportation proceedings.

Over the course of the first two audio recorded meetings on June 13 and 17, 2002, Orenuga and Mobaidin settled on a "reduced" $12,000 tax assessment for Bestway in exchange for an illicit payment of $8,000 to Orenuga. During a videotaped meeting in his office on June 20, 2002, Mobaidin made an initial payment of $3,000. At Special Agent Ervin's suggestion, Mobaidin requested, and Orenuga agreed to give him, $2,000 of the $8,000 for his role in the deception. This move was designed to show that the $8,000 was, in fact, for Orenuga, and not OTR.

A week later, on June 27, the FBI videotaped another meeting at Mobaidin's office where Orenuga received the remaining $3,000. During this meeting, the two men weighed the possibility of a similar deal with one of Mobaidin's other clients. Orenuga proposed that he could conduct fictitious audits, and then Mobaidin would tell his clients that they could reduce their tax liability through a clandestine payment to Orenuga. At one point, when strategizing about the identity of their next target, Orenuga instructed Mobaidin to steer clear of "Jew[s]," "black American[s]," or "white m[e]n," ostensibly to focus on people more susceptible to coercion. *See* Tr. of Recorded Conversation Between Obafemi Orenuga and FBI Cooperating Witness at 6-7 (June 27, 2002) ("June 27

Transcript"), *reprinted in* Record Material for Appellee ("R.M.") tab 5.

The FBI subsequently arranged for a local restauranteur to assist in the investigation by posing as one of Mobaidin's clients. Through a series of recorded conversations, Orenuga planned to fabricate a $40,000 to $50,000 tax deficiency for the restaurant and then "agree" to reduce it to zero for a $20,000 payment ($8,000 of which he would keep for himself). On March 6, 2003, Orenuga was videotaped accepting $13,000 from Mobaidin in exchange for the "clean" audit. Orenuga was then arrested on August 25, 2003.

At trial, faced with the irrefutable audio and video recordings of his illicit dealings with Mobaidin, Orenuga relied on a defense of entrapment. He asserted that Mobaidin relentlessly badgered him to look the other way on the Bestway audit, and eventually the "pressure was so much" that he capitulated. *See* Tr. at 114-23 (4/7/04). Given the centrality of the entrapment defense to Orenuga's case, he requested that the District Court question the venire about their "knowledge and attitude towards" its application. The trial court denied Orenuga's request on the grounds that it would inject "complications" into the *voir dire* and was "not necessary in order to get a fair and impartial jury." Tr. at 3 (4/5/04). In response to Orenuga's suggestion that entrapment was a "novel" defense that might be unfamiliar to many jurors, the District Court judge replied that, while entrapment may not be as familiar as the defenses of self-defense or insanity, the court was not persuaded that it would "be an issue." *Id.* at 4.

Orenuga also objected to the admission of a portion of the videotape evidence. He asserted that his comments regarding Jews, black Americans, and white men during the June 27, 2002 meeting were "inflammatory" and added "little, if anything, to the Government's case." *See* Tr. at 3 (4/6/04). After weighing the issue, the District Court permitted the Government to play

the tape in its entirety, ruling that the contested segment provided "context that is relevant, and not only to the Government's burden in proving its case but also with respect to the defense of entrapment." *Id.* at 88.

Finally, before the jury was given its instructions, Orenuga objected to the District Court's proposed description of the elements required to prove that a public official has committed bribery under 18 U.S.C. § 201(b)(2)(A). Orenuga asserted that an indispensable component of bribery is that the public official must *perform* a *quid pro quo*, which would require proof that Orenuga actually altered the audit figures from what they otherwise would have been. Because the Government allegedly failed to show any adjustment of the tax liability figures, Orenuga argued that the Government's case did not support a finding that he violated the statute. The District Court rejected this reading of the statute, and Orenuga was found guilty on both counts of bribery.

On July 1, 2004, the trial judge sentenced Orenuga to 24 months in federal prison on each count, to be served concurrently, followed by three years' supervised release. *See* Amended Judgment, *United States v. Orenuga*, Crim. No. 03-464 (D.D.C. July 1, 2004), *reprinted in* R.M. tab 8. Orenuga now appeals, and seeks reversal of the District Court's judgment and remand for a new trial.

## II. ANALYSIS

### A. *Jury Instructions and the Entrapment Defense*

Orenuga claims that the District Court violated his Sixth Amendment right to trial by an impartial jury in rejecting his proposed *voir dire* question on the entrapment defense. According to Orenuga, the court was required to submit his proposed query to the venire, because its subject was "central to the case." Br. of Appellant at 16. Orenuga's concern is that some prospective jurors might subscribe to the view that a

defense of entrapment never should be allowed to negate criminal responsibility.

"The Sixth Amendment right to jury trial 'guarantees to the criminally accused a fair trial by a panel of impartial, "indifferent" jurors' . . . ." *United States v. Edmond*, 52 F.3d 1080, 1094 (D.C. Cir. 1995) (per curiam) (quoting *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)). This guarantee includes the right to be tried by jurors who are capable of putting aside their personal impressions and opinions and rendering a verdict based solely on the evidence presented in court. *See id*. *Voir dire* is a vehicle for ensuring this right, *see Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981), as it serves to screen out jurors whose personal views make them incapable of performing this function. *See Edmond*, 52 F.3d at 1094.

In conducting *voir dire* under Federal Rule of Criminal Procedure 24(a), the trial judge "'is accorded broad discretion to mold the manner and mode of [the] examination,'" and there is "'no basis for reversal unless he abuses his discretion, and there is substantial prejudice to the accused.'" *Id.* at 1095 (quoting *United States v. Liddy*, 509 F.2d 428, 435 (D.C. Cir. 1974)). Specific subjects for *voir dire* questioning are "constitutionally compelled" when "the trial court's failure to ask [a] question[] . . . render[s] the defendant's trial fundamentally unfair," but not where the subjects proposed for questioning may be merely "helpful." *Mu'Min v. Virginia*, 500 U.S. 415, 425-26 (1991). The defense always "must be given a full and fair opportunity to expose bias or prejudice on the part of the veniremen," *United States v. Robinson*, 475 F.2d 376, 380-81 (D.C. Cir. 1973), and "'the restriction upon inquiries at the request of counsel, [is] subject to the essential demands of fairness,'" *Morgan v. Illinois*, 504 U.S. 719, 730 (1992) (quoting *Aldridge v. United States*, 283 U.S. 308, 310 (1931)).

Orenuga submits that substantial unfairness occurs when a trial judge declines to present a party's question during *voir dire*

that touches on a matter "clearly central" to the case. *See* Recording of Oral Argument at 10:10. This argument overreaches and finds no concrete basis in the law. In *United States v. Robinson*, the court established that "[t]he possibility of prejudice is real, and there is consequent need for a searching voir dire examination, in situations where, for example, the case carries racial overtones, or involves other matters concerning which either the local community or the population at large is commonly known to harbor strong feelings that may stop short of presumptive bias in law yet significantly skew deliberations in fact." 475 F.2d at 381 (footnotes omitted). The court also noted that *voir dire* must be allowed on subjects with respect to which "bias and distorting influence have become evident, through experience with juries, and have come to be recognized as a proper subject for the *voir dire*." *Id.* The potential for jurors to attach undue weight to the testimony of law enforcement officials during trial is one such example. *See id.* (citing *Brown v. United States*, 338 F.2d 543 (D.C. Cir. 1964)).

We have found no case, and the defense cites to none, in which this circuit or any other circuit has recognized a "commonly known" bias against the entrapment defense, which leaves us with no indication that it is within the "recognized classes" of inflammatory topics that would meet the *Robinson* test. Indeed, the only two circuits to confront this question directly, the Eighth and Tenth Circuits, have both held that it is not an abuse of discretion for a trial court to reject a question regarding prospective jurors' attitudes toward the defense of entrapment. *See United States v. Dion*, 762 F.2d 674, 694 (8th Cir. 1985), *rev'd on other grounds*, 476 U.S. 734 (1986); *United States v. Crawford*, 444 F.2d 1404, 1405 (10th Cir. 1971) (per curiam).

Where, as here, the proposed question does not concern a subject well known to inflame the passions of the community, the party seeking the inquiry bears the burden of showing that

the question "is reasonably calculated to discover an actual and likely source of prejudice, rather than pursue a speculative will-o-the-wisp." *Robinson*, 475 F.2d at 381; *see United States v. Payne*, 944 F.2d 1458, 1474 (9th Cir. 1991). Orenuga failed to establish the requisite foundation to support his novel claim that potential jurors might possess strong feelings about the entrapment defense that would bias their decisions, nor did he demonstrate how his question was designed to uncover any such bias. Indeed, Orenuga concedes that entrapment has a "low[] public profile," Br. of Appellant at 15, and asserts that there is merely a "sense" in the community at large "that people not inclined to do wrong, don't do wrong even . . . under influence," Recording of Oral Argument at 6:05 -:15. These statements alone are not sufficient in this circuit to find that a question is constitutionally compelled. *See United States v. Cockerham*, 476 F.2d 542, 544 n.2 (D.C. Cir. 1973) (per curiam) (noting that when general bias is evident from case law and academic literature, and "the examination of jurors is otherwise brief and limited in scope, or elicits an indication of possible bias against the defense," a *voir dire* question on the subject is appropriate).

Therefore, in the absence of evidence that prejudice against the entrapment defense was likely to be encountered in the community from which the jurors were selected, the District Court did not abuse its discretion in refusing to ask specific questions on this subject. We have no occasion to decide whether it would have been an abuse of discretion for the District Court to *permit* a question on entrapment.

**B. *Admissibility of Videotape Evidence***

Orenuga argues that the District Court's admission of a portion of the June 27, 2002 videotape of his meeting with Mobaidin was improper, because it was unfairly prejudicial. Reprinted below is the transcript of the disputed segment, which picks up as Orenuga assesses the types of people that he and Mobaidin should focus on in any future illicit transactions:

Orenuga: [T]his one was too shrewd, I don't like it. It's like, eh, . . .

Mobaidin: Well, I never met you before, so it's the first time, you know. But, uh, I wish I met you before. I would be settled [as an] accountant instead of going [in]to car deal[ing] and real estate and all of that junk, you know, but.

Orenuga: You have to be able to tell the guy this is it, if you go [to] this guy. . . . If you don't know them, don't do any of this.

Mobaidin: No, no. I know them for ten years, I've been working with the guy.

Orenuga: If it's a Jew, I don't want to deal with him. If it's a black American, I don't want to do that.

Mobaidin: OK. So what do you want to deal with? Foreigners.

Orenuga: Yeah.

Mobaidin: Yeah, he's a foreigner.

Orenuga: It's, eh, it's too dangerous. Like I said. White man, I can't deal with. I just want you to know that.

Mobaidin: White man, you don't want?

Orenuga: White man, he will need to agree with you. All of, most of them will agree and come back and . . . .

June 27 Transcript at 6-7, *supra*, *reprinted in* R.M. tab 5.

Our analysis of whether the trial court should have excluded this evidence is governed by Federal Rule of Evidence 403, which states:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of . . . needless presentation of cumulative evidence.

As applied to this case, the Rule consists of two major components. First, the relevant evidence must be excluded if the prejudice is "unfair." The Supreme Court has described "unfair" prejudice as "speak[ing] to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997). Second, any danger of unfair prejudice must *substantially* outweigh the probative value of the evidence. Since Orenuga properly preserved his objection at trial, we review the District Court's admission of the videotape evidence for abuse of discretion. *See United States v. Ramsey*, 165 F.3d 980, 983 n.3 (D.C. Cir. 1999).

The Government contends that the contested evidence has significant probative value, because Orenuga's volition is a crucial element in both proving the bribery charges and rebutting his entrapment defense. To establish a violation of 18 U.S.C. § 201(b)(2)(A), the Government must show that Orenuga acted "corruptly," which the District Court defined as "performed voluntarily and deliberately and performed with a purpose of either accomplishing an unlawful end or unlawful result." Tr. at 15 (4/8/04). A successful entrapment defense requires evidence that (1) the crime was induced by the Government, and (2) appellant lacked a "predisposition . . . to engage in the criminal conduct." *See Mathews v. United States*, 485 U.S. 58, 63 (1988). The latter inquiry "focuses upon whether the defendant was an 'unwary innocent' or, instead, an 'unwary criminal' who readily availed himself of the opportunity to perpetrate the crime." *Id.* (quoting *Sherman v.*

*United States*, 356 U.S. 369, 372 (1958)). The Government asserts that the contested comments are integral to its case, because Orenuga's statements about future deals, and the types of people with whom he preferred to deal, help establish that he was a willful participant in the charged criminal activity.

Orenuga does not meaningfully rebut the Government's claims. Orenuga's videotaped statements obviously are prejudicial, but this alone does not make the evidence "unfairly" prejudicial. The gravamen of unfair prejudice is "'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Old Chief*, 519 U.S. at 180 (quoting FED. R. EVID. 403 advisory committee's notes). Given the relevance of Orenuga's comments to his participation in the crime – he was discussing the people who would make the best targets for his bribery scheme – any prejudice to which he was subjected was related in no small measure to his culpability.

Orenuga's videotaped statements were also germane to his entrapment defense. It is reasonable to believe that a jury would find Orenuga's comments on the types of people with whom he preferred to deal in illicit arrangements highly probative in assessing whether he acted voluntarily and deliberately and whether he "was disposed to commit the criminal act prior to first being approached by Government agents," *Jacobson v. United States*, 503 U.S. 540, 549 (1992). The District Court thus did not abuse its discretion by permitting the entire videotape to be played at trial.

## C. *The Bribery Charge*

At the conclusion of the trial, the District Court judge instructed the jury that "[i]t is not a defense to the crime of bribery that had there been no bribe, the public official might have lawfully and properly performed the same act." Tr. at 16 (4/8/04). Orenuga argues that this is an erroneous construction of 18 U.S.C. § 201(b)(2)(A), for, in his view, the public official

must perform a *quid pro quo* in order to fall within the ambit of the statute. In the absence of evidence suggesting that he ultimately altered the businesses' liability, Orenuga contends that his crimes were not bribery, but more precisely "defraud[ing] the two businesses by falsely convincing them that they were receiving some concession for their money." Br. of Appellant at 19.

Whether the District Court properly instructed the jury on the standard for bribery presents a question of law that we review *de novo*. *See United States v. DeFries*, 129 F.3d 1293, 1303 (D.C. Cir. 1997) (per curiam). Our job is to "'determine whether, taken as a whole, [the instructions] accurately state the governing law.'" *Id.* at 1304 (quoting *United States v. Washington*, 106 F.3d 983, 1002 (D.C. Cir. 1997) (per curiam)) (alteration in *DeFries*). We find here that they do.

Under 18 U.S.C. § 201(b)(2)(A), a "public official" commits bribery if he or she "directly or indirectly, corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally or for any other person or entity, in return for . . . being influenced in the performance of any official act." The Supreme Court has made it clear that the "acceptance of the bribe is the violation of the statute, not performance of the illegal promise." *United States v. Brewster*, 408 U.S. 501, 526 (1972). In other words, "[t]he illegal conduct is taking or agreeing to take money for a promise to act in a certain way." *Id.*

Orenuga attempts to avoid *Brewster* by pointing to *United States v. Gatling*, 96 F.3d 1511 (D.C. Cir. 1996), where this court stated that an essential feature of bribery is that it "implies a *quid pro quo*." *Id*. at 1522. Contrary to Orenuga's suggestion, however, *Gatling* did not hold that the *quid pro quo* must be fully executed for the act to be considered a bribe. Rather, in distinguishing between a "bribe" and an "illegal gratuity," the court noted merely that a bribe is consummated when "the

defendant accepts money with the *specific intent* of performing an official act in return." *Id.* (emphasis added). *Gatling* is consistent with *Brewster*, as is the court's earlier decision in *United States v. White*, 887 F.2d 267, 272 (D.C. Cir. 1989).

In sum, we find no support whatsoever for Orenuga's reading of the statute. The law unequivocally supports the District Court's instruction to the jury, which was therefore not erroneous.

### III. CONCLUSION

For the foregoing reasons, the judgment of the District Court is affirmed.