# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued April 5, 2007          Decided June 19, 2007

No. 05-3081

UNITED STATES OF AMERICA,
APPELLEE

v.

ANDREW J. LITTLEJOHN, III,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 03cr00472-01)

*Ketanji B. Jackson*, Assistant Federal Public Defender, argued the cause for appellant. With her on the briefs was *A. J. Kramer*, Federal Public Defender. *Mary M. Petras* and *Neil H. Jaffee*, Assistant Federal Public Defenders, entered appearances.

*Sarah T. Chasson*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Jeffrey A. Taylor*, U.S. Attorney, and *Roy W. McLeese, III.* and *John Crabb, Jr.*, Assistant U.S. Attorneys.

Before:  SENTELLE, TATEL, and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

Concurring opinion filed by *Circuit Judge* SENTELLE.

TATEL, *Circuit Judge*:  After United States Park Police officers, pursuant to a warranted search, discovered a handgun in the home appellant shared with his mother and brother, a jury convicted him of unlawful possession of a firearm by a felon in violation of 18 U.S.C. § 922(g).  Appellant challenges his conviction, arguing that (1) the government produced insufficient evidence that he constructively possessed the weapon, (2) the district court erred by admitting evidence that appellant was the target of the warrant, and (3) the district court's use of compound voir dire questions deprived him of his Sixth Amendment right to an impartial jury.  Although we find the evidence sufficient to establish constructive possession and see no abuse of discretion regarding the evidentiary ruling, we agree with appellant that under the particular circumstances of this case the district court's use of compound questions violated the Sixth Amendment.  We therefore vacate appellant's conviction and remand for further proceedings consistent with this opinion.

**I.**

Shortly after 7 a.m. on October 1, 2003, several uniformed U.S. Park Police officers executed a search warrant at a home at 457 Burbank Street, S.E.  Residing in the house were Mary Littlejohn, who owned the home, and her son, Appellant Andrew Littlejohn.  Although Andrew's brother, Wildred Littlejohn, lived in a nearby college dormitory, he

returned home frequently. On this morning, however, only Andrew Littlejohn was home.

Upon arrival, Officer Mark Adamchik, dressed in a SWAT team uniform, knocked on the door while his partner announced their presence. At trial, Adamchik testified that he saw Andrew Littlejohn peek through the blinds in the door window, whereupon his partner announced, "Police with a search warrant, open the door." Nov. 17, 2004 Trial Tr. at 70–71. Instead of complying, Littlejohn urged the officers to "Hold on a second" or "Hold on a minute." *Id.* at 71. Littlejohn then disappeared behind the blinds, and after a few seconds of silence, the SWAT team broke down the door with a battering ram. Adamchik entered the house and ascended the stairs to the second floor.

Understanding the issues before us requires an accurate picture of the second floor. A hallway runs perpendicular to the top of the stairs. To the right of the stairs are two doors, one leading to Mary Littlejohn's bedroom and the other to a bathroom. To the left of the stairs are two more doors. One of those doors, at the end of the hall, leads to what witnesses referred to as the "left rear bedroom." The other door, leading to the "right rear bedroom," is along the hallway and near the door to the left rear bedroom.

Officer Adamchik testified that as he climbed the stairs, he looked through the railing and saw Andrew Littlejohn six to twelve inches outside the door to the left rear bedroom "moving in a hurried manner" down the hall towards the bathroom. *Id.* at 74. Adamchik ordered Littlejohn to "get on the ground" and Littlejohn complied. *Id.* at 75.

With Littlejohn secured, other officers began searching the house. In the left rear bedroom, they noticed a laundry basket approximately four to five feet from the door. Inside the basket and beneath clothes and sheets, the officers discovered a loaded 9-millimeter semi-automatic pistol. No fingerprints were recovered from the weapon or the rounds inside it. Also in the left rear bedroom, the officers found two pieces of mail addressed to Andrew Littlejohn and two career training certificates in his name. The officers discovered other documents bearing Andrew Littlejohn's name in the right rear bedroom (including his high school diploma) as well as throughout the rest of the house. On cross-examination, Investigator David Hurley, the officer in charge of collecting evidence, testified that although he saw documents with Wildred's name on them, he seized only documents bearing Andrew's name.

After waiving his *Miranda* rights, Littlejohn admitted to Investigator Hurley that he lived in his mother's home. Although Littlejohn told Hurley that the bedroom "on the left" was his, he subsequently "clarified" that he meant the right rear bedroom. Nov. 16, 2004 Trial Tr. at 147; Nov. 17, 2004 Trial Tr. at 29. Littlejohn also told Hurley that his brother Wildred had last been in the house three days earlier.

The defense presented a single witness, Mary Littlejohn. She testified that Andrew lived in the right rear bedroom, while the left rear bedroom, where the gun was found, belonged to Wildred. She also testified that Wildred used the basket containing the gun to carry his laundry to and from school.

Following a trial on the only contested question—whether Littlejohn constructively possessed the weapon—the jury convicted him of unlawful possession of a firearm by a felon in violation of 18 U.S.C. § 922(g). Littlejohn appeals, presenting three claims. First, he challenges the sufficiency of the evidence against him. Second, he contests an evidentiary ruling in which the district court permitted Investigator Hurley to identify Littlejohn as the subject of the warrant. Third, he argues that the district court's use of compound voir dire questions deprived him of his Sixth Amendment right to an impartial jury. We consider each claim in turn.

## II.

We review challenges to the sufficiency of the evidence de novo, viewing the "evidence in the light most favorable to the government, and affirm[ing] a guilty verdict where any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Wahl*, 290 F.3d 370, 375 (D.C. Cir. 2002) (internal quotation marks and emphasis omitted). Moreover, we "giv[e] full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact." *United States v. Foster*, 783 F.2d 1087, 1088 (D.C. Cir. 1986) (internal quotation marks omitted).

To establish constructive possession, the government must show that "the defendant knew of, and was in a position to exercise dominion and control over, the contraband." *United States v. Byfield*, 928 F.2d 1163, 1166 (D.C. Cir. 1991). Thus, "there must be something more than mere presence at the scene of a criminal transaction. There must be

some action, some word, or some conduct that links the individual" to the contraband. *United States v. Pardo*, 636 F.2d 535, 549 (D.C. Cir. 1980). "[E]vidence of some other factor—including . . . evasive conduct . . . coupled with proximity may surpass the minimum threshold of evidence needed to put the question of guilt to a jury." *United States v. Gibbs*, 904 F.2d 52, 56 (D.C. Cir. 1990); *see United States v. Hernandez*, 780 F.2d 113, 120 (D.C. Cir. 1986) (considering evasive conduct, among other evidence, as demonstrating constructive possession); *United States v. Reese*, 561 F.2d 894, 898 (D.C. Cir. 1977) (same).

Littlejohn argues that the evidence proves nothing more than his proximity to the gun, not his possession of it. The documents found in the left rear bedroom, he asserts, establish only that he had access to that room, not that he possessed its contents. Discounting the evidence that he fled from the officers after seeing them at the front door, Littlejohn contends that the government's theory—that he ran upstairs to hide the gun—is both "inconceivable" and "sheer speculation." Appellant's Br. 23.

This is a close case, but given our deferential standard of review, we find the evidence sufficient to support the conviction. Contrary to Littlejohn's claim, proximity to the weapon was not the government's only evidence. According to trial testimony, after seeing several fully-uniformed Park Police officers on his doorstep, Littlejohn ran upstairs. Officer Adamchik then discovered Littlejohn exiting the very room in which the gun was recovered, and the weapon was hidden in an easily accessible location only a few feet inside the room. Given this evidence, we think it not "inconceivable" that a reasonable jury could have concluded

that after seeing the Park Police officers through the front door window, Littlejohn evaded them by fleeing upstairs and hiding the gun in the laundry basket.

Relying on *United States v. Watkins*, 519 F.2d 294 (D.C. Cir. 1975), Littlejohn argues that evasive conduct and proximity are, by themselves, insufficient to support an inference of constructive possession. In *Watkins*, after police officers knocked on the door to an apartment, an individual other than the defendant opened the door and, seeing the officers, quickly closed it. Announcing they had a warrant but receiving no answer, the officers forced open the door. Inside, they found the defendant in a bedroom where they also discovered narcotics. The only evidence linking the defendant to the apartment, other than her presence, consisted of a few books inscribed with her name. *Id.* at 298. We found this evidence insufficient to establish that the defendant constructively possessed the narcotics.

Contrary to Littlejohn's assertion, nothing in *Watkins* stands for the proposition that evasive conduct combined with proximity is insufficient to support an inference of constructive possession. That issue was not before us in *Watkins* because the record contained no evidence that Watkins, as opposed to the individual who closed the door, evaded the officers.

*Watkins* differs from this case for another reason. There, we emphasized the very limited evidence that the defendant lived in or even frequently visited the apartment where the contraband was found. *Id.* By contrast, Littlejohn confessed to living in the house where the gun was discovered, and although the defense later introduced evidence that the left

rear bedroom belonged to his brother, the fact that Littlejohn kept personal documents in the bedroom (such as mail and employment training certificates) suffices to establish that he had joint access to and control over the room. As we have held, "[a] jury is entitled to infer that a person exercises constructive possession over items found in his home," an inference that "applies even when that person shares the premises with others." *United States v. Morris*, 977 F.2d 617, 620 (D.C. Cir. 1992).

## III.

The second issue before us relates to Investigator Hurley's testimony. During his direct examination, Hurley testified that he and the other Park Police officers arrived at Littlejohn's home to execute a search warrant, but he did not explain why the warrant had been issued. On cross-examination, defense counsel pointed out that although Hurley testified he had found documents bearing Wildred's name, "the only documents that you actually picked up that day were documents that had Andrew Littlejohn's name on [them]." Nov. 16, 2004 Trial Tr. at 167–68. On redirect and over Littlejohn's objection, the district court allowed Hurley to testify that the warrant permitted the officers to search for and seize documents relating to Andrew Littlejohn. According to Littlejohn, this additional testimony was both irrelevant and prejudicial. Given our highly deferential standard of review, however, we can quickly dispense with this claim. *See United States v. (Thomas) West*, 393 F.3d 1302, 1309 (D.C. Cir. 2005) ("When a relevance objection is made at trial, admission of the referenced evidence is reviewed for abuse of discretion."); *United States v. King*, 254 F.3d 1098, 1100 (D.C. Cir. 2001) (reviewing for abuse of

discretion district court's decision that evidence's probative value is not "substantially outweighed by the danger of unfair prejudice," FED. R. EVID. 403).

As the government points out, defense counsel's "cross-examination of Investigator Hurley left the distinct impression that the police had irrationally cherry-picked evidence to shore up the case against" Littlejohn. Appellee's Br. 22. Indeed, Littlejohn continues to argue that Hurley "cherry-picked" the evidence. Appellant's Br. 32. By questioning Hurley's motive in seizing only documents bearing Andrew Littlejohn's name, defense counsel made the subject of the warrant relevant. Once she opened the door, the government was entitled to rehabilitate its witness by offering evidence of an alternative explanation for the investigator's actions, namely that instead of trying to pin the gun on Littlejohn, the officers were simply executing a warrant that authorized them to seize his documents. The district court, moreover, limited any prejudicial effect of this testimony by barring the government from inquiring into why Littlejohn had been under investigation. We thus find no abuse of discretion in the district court's ruling.

## IV.

This brings us to the trickiest issue in this case: Littlejohn's challenge to the form of questioning the district court employed during voir dire. The district court asked prospective jurors thirty-two questions, six of which were compound questions. For the twenty-six non-compound questions, which Littlejohn does not challenge, prospective jurors answering in the affirmative were asked by the court to approach the bench. The court and attorneys from both sides

then asked follow-up questions, enabling the court to determine whether the potential source of bias constituted grounds to dismiss the prospective juror for cause.

The six challenged compound questions were constructed quite differently. For example, the district court asked the prospective jurors whether they, their families, or their close friends are or ever were employed in law enforcement. But instead of directing the prospective jurors to answer that question, the court repeatedly instructed them to remain silent unless (1) they would have answered yes, and (2) they believed that their law enforcement experience would render them unable to evaluate the evidence impartially. The court asked the question as follows:

> The Court: . . . Ladies and gentlemen, this next question is another one of those two-part questions, okay, so listen carefully. If your answer to the first question is yes, don't raise your hand right away, but listen very carefully to the second question. If your answer to that question is yes, you must raise your hand and come up and talk to the Court about the issue. Okay?
>
> Now, here is the first question. And, again, you don't need to raise your hand. Listen carefully. This is a question about you personally, you personally as well as any close family member or close personal friend.
>
> Is there anyone in that group, either you personally, close family member or close

personal friend, who is either presently or previously employed by any law enforcement agency? . . . . Now, if the answer to that is yes, listen very carefully to this question.

As a result of that experience that either you had personally or are having right now as an employee, as a result of that experience or as a result of the experience of a close family member or a close friend, . . . do you believe that you, that you personally would be unable to be fair and impartial to both sides if selected as a juror in this case?

Nov. 16, 2004 Trial Tr. at 37–38. The five other compound questions covered several additional sources of potential bias:

1) whether any of the prospective jurors "know any member or members of this jury panel," and, if so, whether this would render them unable to evaluate the evidence impartially, *id.* at 23–24;

2) whether any of the prospective jurors, their families, or their close friends were "currently or previously employed by any criminal defense attorney or [had] been involved in any way in the defense of criminal cases," and, if so, whether this would render them unable to evaluate the evidence impartially, *id.* at 43–44;

3) whether any of the prospective jurors were attorneys or studying the law, and whether, if so,

this would render them unable to follow the judge's instructions, *id.* at 44;

4) whether any of the prospective jurors had previously served as grand jurors, and, if so, whether this experience would render them unable to apply the higher standard of proof required in a criminal trial, *id.* at 44–45; and

5) whether any of the prospective jurors had served as a juror in a prior criminal case and, if so, whether this experience would render them unable to evaluate the evidence impartially, *id.* at 45–46.

While posing these questions, the district court repeatedly instructed the prospective jurors that even if they would have answered the first part of the question affirmatively, they were to remain silent unless they believed this potential source of bias would prevent them from fulfilling their duties as jurors. *See, e.g.*, *id.* at 23–24, 37, 43, 44, 45.

After the district court asked the first compound question, defense counsel objected. She argued that the compound format of the questions left her no opportunity to make an independent determination of potential bias, leaving that evaluation "completely up to the jurors." *Id.* at 25. The district court overruled the objection.

Renewing this argument on appeal, Littlejohn focuses on the above-quoted compound question regarding whether the jurors, their families, or their close friends are or have been employed in law enforcement. As Littlejohn points out, unless a prospective juror who worked in law enforcement believed

that such employment would render impartial jury service impossible, neither he nor the court would have any way of knowing about this potential source of bias. This, he argues, violates his Sixth Amendment right to an impartial jury.

"*Voir dire* examination serves the dual purposes of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges." *Mu'Min v. Virginia*, 500 U.S. 415, 431 (1991). The first purpose implicates the Sixth Amendment; the second is statutory. *See United States v. Martinez-Salazar*, 528 U.S. 304, 311 (2000) ("[U]nlike the right to an impartial jury guaranteed by the Sixth Amendment, peremptory challenges are not of federal constitutional dimension."). Making only the constitutional argument, Littlejohn claims that the compound questions prevented the court from selecting an impartial jury and thus violated his rights under the Sixth Amendment.

The Sixth Amendment "includes the right to be tried by jurors who are capable of putting aside their personal impressions and opinions and rendering a verdict based solely on the evidence presented in court." *United States v. Orenuga*, 430 F.3d 1158, 1162 (D.C. Cir. 2005). In order to protect this right, "[t]he defense always must be given a full and fair opportunity to expose bias or prejudice on the part of the veniremen." *Id.* at 1163 (internal quotation marks omitted); *see also Morford v. United States*, 339 U.S. 258, 259 (1950) (per curiam) (reversing conviction because defendant had been denied "the opportunity to prove actual bias," which is "a guarantee of a defendant's right to an impartial jury" (internal quotation marks omitted)). Although voir dire protects this crucial Sixth Amendment right, the Supreme Court has observed that "the adequacy of *voir dire* is not easily subject

to appellate review." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981). As the Court explained, empaneling a jury able to view the evidence dispassionately and follow the law requires the district court to examine sources of potential bias and evaluate the credibility of answers given by prospective jurors, a role "not unlike that of the jurors later on in the trial." *Id.* We thus accord district courts "ample discretion in determining how best to conduct the *voir dire*," *id.* at 189, including the "mode and manner of proceeding" and "the range of questions put to the prospective jurors," *United States v. Robinson*, 475 F.2d 376, 380 (D.C. Cir. 1973). We will reverse the district court only if it "abuses [its] discretion, and there is substantial prejudice to the accused." *United States v. Liddy*, 509 F.2d 428, 435 (D.C. Cir. 1974).

This is not the first time we have considered the constitutionality of compound voir dire questions. In a decision released after Littlejohn's trial, *United States v. West*, 458 F.3d 1 (D.C. Cir. 2006), we considered precisely the same compound question challenged here—whether the potential jurors, their family members, or their close friends were or ever had been employed in law enforcement. There, as here, prospective jurors were instructed not to answer the first part of the question unless they believed that this potential source of bias would make it impossible to serve impartially. Criticizing the compound nature of the question, we pointed out that it "prevent[ed] the parties from learning the factual premise of the first part of the question, relying instead upon the juror's self-assessment of his or her impartiality." *Id.* at 10–11. "Undoubtedly," we noted, "there are occasions upon which further questioning is needed to permit the trial court to make its own judgment of a juror's impartiality based on objective facts, rather than relying exclusively on the jurors'

subjective determinations of whether they [are] prejudiced." *Id.* at 11 (alteration in original, internal quotation marks omitted) (quoting *United States v. Caldwell*, 543 F.2d 1333, 1345 (D.C. Cir. 1974)). In particular, we pointed out that

> the possibility of prejudice is real, and there is consequent need for a searching voir dire examination, in situations where, for example, the case carries racial overtones, or involves other matters concerning which either the local community or the population at large is commonly known to harbor strong feelings that may stop short of presumptive bias in law yet significantly skew deliberations in fact. . . . [V]oir dire must be allowed on subjects with respect to which bias and distorting influence have become evident, through experience with juries, and have come to be recognized as a proper subject for the voir dire. This circuit has held that the potential for jurors to attach undue weight to the testimony of law enforcement officials during trial is one such example.

*Id.* at 11 (internal quotation marks, alterations, and citation omitted) (quoting *Orenuga*, 430 F.3d at 1163, and *Robinson*, 475 F.2d at 381). Finally—and critically to the case before us—we warned that "more searching voir dire may be required with respect to a prospective juror's employment." *Id.* at 12. As an example, we cited *United States v. Segal*, 534 F.2d 578 (3d Cir. 1976), in which the Third Circuit ordered a new trial where the district court, in a case involving the alleged bribery of an IRS agent, had refused to inquire whether prospective jurors or members of their immediate families worked for the

IRS. "[P]ast employment by the specific agency prosecuting the case," the Third Circuit held, "is a matter which should be explored upon a party's request." *Id.* at 581. For all these reasons, we "'caution[ed] trial judges not to test the outer limits of their discretion' and, '[i]n particular, . . . to avoid asking compound questions of prospective jurors.'" *West*, 458 F.3d at 13 (second alteration in original) (quoting *United States v. Edmond*, 52 F.3d 1080, 1099 (D.C. Cir. 1995)).

Despite our deep reservations about compound questions, we found no Sixth Amendment violation in *West*. Emphasizing that "our approval of the trial court's actions is inextricably linked to the particular circumstances of this case," *id.* at 13 (internal quotation marks omitted) (quoting *Edmond*, 52 F.3d at 1099), we concluded that several factors, considered collectively, ensured that the defendant had sufficient information to challenge any prospective juror based on possible bias in favor of law enforcement. First, both parties had received a list of the current occupations of all prospective jurors. Although the list contained no information about past employment, we found this omission untroubling because the defendant never requested such information. Second, several non-compound questions bore on other law enforcement experiences that prospective jurors may have had. They were asked whether they or their close relatives or friends had ever experienced anything that would lead them to be biased in favor of or against testimony by law enforcement officers; whether they had been a victim of, witness to, or charged with a crime; whether they knew the prosecutor, the defense attorney, the defendant, or any potential witness; and whether they knew of "any reason that you can think of, even though we haven't covered it in a question, that you believe is a basis for your inability to sit fairly, attentively, and

impartially if selected as a juror." *Id.* at 7. Third—and "perhaps most important"—"the credibility of the police witnesses was not at issue at trial." *Id.* at 7–8. As we pointed out, questions aimed at weeding out potential jurors who would give unwarranted credence to the testimony of law enforcement officers are less important where, as in *West*, the defendant concedes the validity of the officer's testimony. *Id.* at 7–8. "Considering all of these factors together," we concluded that the voir dire gave the defendant sufficient information about potential law enforcement bias. *Id.* at 8. We thus found no abuse of discretion.

Although we could have stopped at this point and affirmed the conviction, we nonetheless went on to find that the use of compound questions caused no substantial prejudice. In addition to the three factors listed above, several considerations led us to that conclusion. First, the district court expressly instructed the jury to give no special weight to the testimony of law enforcement officers. Second, the record contained "overwhelming" evidence of the defendant's guilt: the facts were not only undisputed, but they also clearly established that the defendant constructively possessed the gun. *Id.* at 8. Third, the defendant never alleged that any specific juror harbored actual bias against him.

Littlejohn argues that several of the "particular circumstances" that led us to affirm the conviction in *West* notwithstanding our concern about the compound questions are absent here. We agree and conclude that under the particular circumstances of this case, the district court's use of compound questions violated Littlejohn's Sixth Amendment right to an impartial jury.

To begin with, unlike in *West*, Littlejohn expressly asked the court to question potential jurors about past or present employment in law enforcement. Specifically, he proposed the following non-compound question:

> Have you or any of your relatives or any close friends ever worked, in any capacity, for (or have an application pending to work for) any type of law enforcement agency, including: the Metropolitan Police Department, the Federal Bureau of Investigation, . . . the United States Park Police, . . . [or] any other federal, state or local law enforcement agency?

Def.'s Proposed Voir Dire Questions 7, ¶ 19. Indeed, recognizing the potential for juror bias, the government proposed a very similar question. *See* Gov't's Proposed Voir Dire Questions 6, ¶ 11 ("Are you or any of your family or close friends or household members a law enforcement officer . . . ?"). The fact that Littlejohn's proposed question asked not only about any employment in law enforcement generally, but also about employment by the U.S. Park Police—the agency whose officers arrested Littlejohn—is particularly significant given that in *West* we made clear that "this would have been a much closer case" had the defendant requested the court to ask about past or present employment by the Metropolitan Police Department, the agency responsible for the arrest in that case. 458 F.3d at 13.

The district court, however, asked neither question, requiring instead that jurors answer the compound question quoted above. *See supra* pp. 10–11. The defect in that question is obvious, as a simple hypothetical demonstrates.

Suppose one of the prospective jurors was a thirty-year veteran of the U.S. Park Police. Had the district court asked Littlejohn's proposed question, the juror would have had to answer in the affirmative, giving Littlejohn and the court an opportunity to explore that potential source of bias. But in response to the district court's compound question, the prospective juror had to keep that information secret unless the juror, in his or her own opinion, believed that working for the Park Police would make it impossible to serve impartially. Yet as we stated in *United States v. Edmond* and restated in *West*, "whether a juror can render a verdict based solely on evidence adduced in the courtroom should not be adjudged on that juror's own assessment of self-righteousness without something more." *West*, 458 F.3d at 11 (internal quotation marks omitted) (quoting *Edmond*, 52 F.3d at 1097). And as *West* recognizes, such self-evaluation is particularly troublesome when jurors are asked about the potential bias caused by their employment history. Even the most scrupulous juror may not recognize that "lingering loyalty [to a past employer], friendship of persons still employed there, or knowledge of agency procedures" may color his or her judgment. *Segal*, 534 F.2d at 581.

The circumstances of this case differ from *West* in other important respects. First, unlike in *West*, nothing in the record indicates that Littlejohn received a list of the present occupations of prospective jurors—a particularly serious omission given the likely reluctance of jurors to decide a case against a current employer.

Second, again unlike in *West*, where the defendant conceded the validity of the officer's testimony, Littlejohn vigorously challenged the testifying officers' credibility. The

government relied heavily on Officer Adamchik's testimony that he saw Littlejohn leaving the left rear bedroom. *See supra* pp. 3, 6. Seeking to impeach that testimony, defense counsel questioned Adamchik about the difference between his testimony at trial—that he saw Littlejohn leaving the left rear bedroom at the end of the hall where the gun was found—and a previous report in which Adamchik wrote that he saw Littlejohn exiting the bedroom at the "top of the stairs," i.e., the right rear bedroom. Nov. 17, 2004 Trial Tr. at 85, 182–83. In what the government itself labels Littlejohn's "strongest attack on the officers' credibility," Appellee's Br. 39, defense counsel also questioned Adamchik about his testimony that Littlejohn's body position and direction of motion demonstrated that Littlejohn had just exited the left rear bedroom—an issue counsel again focused on in her closing. Nov. 17, 2004 Trial Tr. at 88, 181–82. And as discussed above, *see supra* Part III, defense counsel, attempting to combat Investigator Hurley's testimony that he found Littlejohn's documents in the left rear bedroom, argued—again using the government's own words—"that [Littlejohn] had been framed through the police's cherry-picking of evidence." Appellee's Br. 23. Summarizing this point in closing, defense counsel argued that "Andrew Littlejohn was the only one in the house, so the police decided that that was Andrew Littlejohn's gun. They have done everything they can to convince you of that . . . ." Nov. 17, 2004 Trial Tr. at 178. Given these arguments, the jury could never have convicted Littlejohn without crediting Officer Adamchik and Investigator Hurley's testimony. Yet because of the compound question, neither the district court nor we have any idea whether this critical credibility assessment may have been made by jurors whose association with law enforcement—perhaps even with the U.S. Park Police

itself—predisposed them to favor the testimony of the two officers.

Third, although we have found the evidence sufficient to support Littlejohn's conviction, *see supra* Part II, that evidence is hardly "overwhelming," as it was in *West*. 458 F.3d at 8. There, not only did the police find the gun in a bag lying at defendant's feet, but the defendant confessed that the bag was his and that he had packed it himself. *Id.* By contrast, Littlejohn never admitted ownership of the laundry basket where the gun was hidden. Indeed, his mother testified that both the laundry basket and the entire left rear bedroom belonged to Andrew's brother Wildred. Although the government's evidence revealed that Andrew Littlejohn also had access to the left rear bedroom, joint access weakens the normal inference that one possesses everything found in one's home. *See United States v. Dykes*, 406 F.3d 717, 721 (D.C. Cir. 2005). Further weakening the case against Littlejohn, the government recovered no fingerprints from the gun and presented no testimony of anyone who had ever seen Littlejohn with the weapon. Although jurors could have drawn reasonable inferences from the evidence to find Littlejohn guilty, the record hardly compels that result.

To be sure, some of the circumstances that led us to conclude that the compound questions in *West* did not offend the Sixth Amendment are also present here. For example, as in *West*, several non-compound questions touched on law enforcement issues generally, including whether the prospective jurors personally knew any of the testifying officers and whether they had witnessed a crime or been victimized by one. The district court also asked the prospective jurors whether they would "be inclined to give

greater . . . weight to a police officer's testimony . . . simply because he or she is a police officer," Nov. 16, 2004 Trial Tr. at 29, and later instructed the jury not to do so, Nov. 18, 2004 Trial Tr. at 26. Certainly these questions and this instruction reduced the threat of potential bias. None, however, directly addressed the precise issue raised by Littlejohn (but not by the defendant in *West*), namely whether the prospective jurors, their families, or close friends actually worked for the law enforcement agency whose officers were to testify at trial—a question we said in *West* would have made that "a much closer case." 458 F.3d at 13.

Finally, the government points out that Littlejohn failed to allege that any member of the jury actually harbored bias against him, emphasizing that *West* termed this factor "critical[]." *Id.* at 8. In *West*, however, we considered the defendant's failure to demonstrate actual bias only after concluding that the other relevant circumstances—the defendant's failure to dispute the officers' credibility, the overwhelming evidence of guilt, and the fact that the defendant had other sources for obtaining the only information he had requested—demonstrated that the compound questions caused no prejudice. *Id.* at 8–9. The circumstances here point in the opposite direction: police officer credibility lies at the heart of the case; the evidence against Littlejohn, though sufficient, is far from overwhelming; and the non-compound voir dire questions were inadequate to ensure that Littlejohn had an opportunity to uncover a potentially serious source of bias—whether any potential juror had ever worked for the U.S. Park Police. Under these circumstances, Littlejohn's failure to show actual bias was hardly "critical."

Because under the "particular circumstances of this case," *West*, 458 F.3d at 13, the district court's compound questions denied Littlejohn "a full and fair opportunity to expose bias or prejudice on the part of the veniremen," *Orenuga*, 430 F.3d at 1163, we vacate the conviction and remand for further proceedings consistent with this opinion.

*So ordered.*

SENTELLE, *Circuit Judge*, *concurring*: I join without reservation, and indeed with enthusiasm, the full opinion of the majority. I write separately only to express my concern with language from *United States v. West*, 458 F.3d 1 (D.C. Cir. 2006). As the majority notes, the *West* decision contains the statement, in rejecting a defendant's assertion of violation of his Sixth Amendment right to an impartial jury, that "Finally, and critically, West does not allege that any juror who sat on his case was actually biased against him." *West*, 458 F.3d at 8. I do not take that sentence to establish a requirement that in order to prove a violation of Sixth Amendment rights by an inadequate voir dire or other prejudicial error in jury selection, a defendant must identify an actually biased juror who sat on the case. Such a hurdle seems to me to be impractical and in most cases impossible. Absent some unlikely extra-judicial utterance by such a juror or some extrinsic evidence not extant in most cases, a defendant could not know, let alone establish the prejudice of a particular juror.

Indeed, after the entry of a verdict, unless the defendant makes a request before the jury is discharged, neither he nor counsel may contact jurors except upon a showing of "good cause." D.C. LOCAL CRIM. RULE 24.2(b). Even if defense counsel timely makes such a request, however, "the Court shall inform the jury that no juror is required to speak to anyone but that a juror may do so if the juror wishes." *Id.* And even if a juror chooses to speak to the defendant or his attorney, Federal Rule of Evidence 606(b) strictly limits what evidence may be admissible in challenging the verdict's validity. *See* F.R.E. 606(b) (limiting post-verdict juror testimony to "(1) whether extraneous prejudicial information was improperly brought to the jury's attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the verdict onto the verdict form."). Although these rules play an important role in preventing juror harassment, *see Tanner v. United States*, 483 U.S. 107, 119-20

2

(1987) (discussing juror harassment as one of the "[s]ubstantial policy considerations" justifying restrictions on post-verdict testimony), they make demonstrating actual bias nigh impossible. Requiring proof of actual bias in every case, moreover, would place the defendant in a Catch-22 situation. The Supreme Court justifies the strict limitations on post-verdict juror testimony on the grounds that voir dire ensures "[t]he suitability of an individual for the responsibility of jury service." *Id.* at 127. Those rules, in other words, assume proper voir dire. Yet if proof of actual bias were required in all circumstances, those same rules would prevent a defendant from successfully challenging a defective voir dire.

I do not believe that the extracted sentence from the *West* opinion was intended to establish that a juror must make such a showing of actually biased membership on the jury in order to prevail on a Sixth Amendment claim relating to jury selection. As the majority notes, the sentence follows a discussion of the compelling reasons why the compound questions in the *West* jury selection did not constitute prejudicial violations of the defendant's Sixth Amendment rights. I therefore believe that the sentence only intended to emphasize that in addition to the failure of his generalized claim, the appellant had not raised any claim of specific juror bias. This interpretation of the sentence is supported by the fact that the *West* court relied on *United States v. Haldeman*, 559 F.2d 31, 70-71 (D.C. Cir. 1976). The cited portion of *Haldeman* follows a thorough and laudatory discussion of the voir dire procedure followed in that case. That discussion concluded with the observation that:

> Indeed, no one who reads this transcript can fail to be impressed with the patience, attention, and acumen with which the judge probed the opinions of the veniremen so as to remove those who harbored any prejudice or preconception.

*Id.* at 70. The section relied upon by the *West* court immediately follows and states:

> Our conclusion that the *voir dire* was adequate does not end our review of the jury selection. As is our duty, we have reviewed the record to ascertain for ourselves whether appellants were tried by an unbiased jury capable of basing its verdict solely on the evidence introduced at trial. Appellants appear to concede this ultimate conclusion, for they never suggest that the jury was actually prejudiced against them or that its verdict rested on anything other than the overwhelming evidence of their guilt. On the basis of our own review, we have no doubt that the jury was impartial. Accordingly, we find no reversible error associated with the impaneling of the jury.

*Id.* at 70-71. Therefore, I think it plain that neither the *West* nor the *Haldeman* opinion was holding that a showing of actual bias by a juror or jurors is necessary to the establishment of a Sixth Amendment violation, but only that such a showing would be sufficient. In the absence of such a showing, the defendant must show some other evidence of bias in the jury selection or composition. The defendants in *Haldeman* and *West* could not meet that need to show other evidence. As well established in the majority opinion, the appellant before us has.